**Rosalie HARMAN and Diane Lampert Stadler, Plaintiffs–Appellees,**

v.

**The CITY OF NEW YORK, The Human Resources Administration, Child Welfare Administration, Marva Hammons, Commissioner and Kathryn Croft, Executive Deputy Commissioner, Defendants–Appellants.**

No. 585, Docket 97–7377.

United States Court of Appeals, Second Circuit.

Argued Nov. 3, 1997.

Decided March 19, 1998.

Margaret G. King, Assistant Corporation Counsel, New York City (Paul A. Crotty, Corporation Counsel of the City of New York, Barry P. Schwartz, Assistant Corporation Counsel, of counsel), for Defendants–Appellants.

Jeremiah S. Gutman, New York City (Levy, Gutman, Goldberg & Kaplan; Christopher T. Dunn, Norman Siegel, Arthur N. Eisenberg, New York Civil Liberties Union Foundation, of counsel), for Plaintiffs–Appellees.

(Gregory O'Duden, General Counsel, Elaine Kaplan, Deputy General Counsel, Barbara A. Atkin, Associate General Counsel for Appellate Litigation, National Treasury Employees Union, Washington, DC), for National Treasury Employees Union as Amicus Curiae in Support of Appellees.

Before OAKES and PARKER, Circuit Judges, and RAGGI,* District Judge.

OAKES, Senior Circuit Judge:

Defendants, the City of New York, the Child Welfare Administration of the City of New York ("CWA") of the Human Resources Administration ("HRA"), and two individual defendants, (collectively, "the City"), appeal from the final judgment of the United States District Court for the Southern District of New York, Denise Cote, *Judge,* entered on March 17, 1997. The district court found the

* The Honorable Reena Raggi, District Judge of the United States District Court for the Eastern District of New York, sitting by designation.

press policies of two city agencies, the Administration for Children's Services ("ACS") and the HRA, to violate the First Amendment rights of agency employees. The challenged press policies forbid employees from speaking with the media regarding any policies or activities of the agency without first obtaining permission from the agency's media relations department. The City contends that these policies are necessary to meet the agencies' obligations under federal and state law to protect the confidentiality of reports and information relating to children, families, and other individuals served by the agencies. Further, the City argues that these policies promote the effective operation of the organizations. Because we agree with the district court that the City has not demonstrated any actual harm justifying such a broad restriction on the ability of employees to comment on the workings of the city agencies, we affirm.

## I. BACKGROUND

### A. The City Social Service Agencies and the Media Contacts Policies

HRA, a large municipal agency, provides a broad range of social services to City residents, and formerly included the CWA (Child Welfare Administration). HRA, as presently constituted, administers the State's public assistance employment, food stamp, medical assistance, and food distribution programs. In addition, HRA provides services for victims of domestic violence, adults needing home care or protective assistance, persons with AIDS, and elderly persons with special needs.

On February 12, 1996, the City separated CWA from HRA and created an independent child welfare agency called the Administration for Children's Services ("ACS"). ACS's primary functions include investigating reports of abuse and neglect of children in New York City, providing prevention services to families to maintain the welfare of children, and administering the City's programs relating to foster care and adoption. ACS currently employs over 6,500 people, including approximately 900 caseworkers.

Numerous federal and state laws require ACS, as they did CWA, to keep all case records, reports, and information relating to specific children or families confidential. *See, e.g.,* N.Y. Soc. Serv. Law §§ 372, 422(4)(A) (McKinney 1992 & Supp.1997–98). Similar federal and state laws and regulations govern case records and information held by HRA.[1] Disclosure of statutorily confidential information, or failure to take reasonable security precautions that leads to such disclosure, is a misdemeanor under state social service regulations. *See* N.Y.Comp.Codes R. & Regs. tit. 18, § 465.1(2)(iv) (1997). However, under a new law enacted simultaneously with the creation of ACS, the commissioner of a social services agency has discretion to disclose certain categories of confidential information relating to abused or neglected children if she deems such disclosures not contrary to the best interests of the child or children involved. *See* N.Y. Soc. Serv. Law § 422–a(1) (McKinney Supp.1997–98). The legislature's purpose in allowing this exception was to increase the capacity for oversight and monitoring of the child welfare system, to increase the information available to the public, and to increase the accountability of ACS. *See id.* § 422–a note (Historical and Statutory Notes).

At issue in this case are executive orders promulgated by the City which govern contacts between the media and employees of the City's social service agencies. The first incarnation of this policy was HRA Executive Order 634, which was issued on March 1,

---

1. *See, e.g.,* 42 U.S.C. § 602(a)(9) (1994) (mandating that state plans for aid and services to needy families with children must provide safeguards to restrict the disclosure of information concerning applicants or recipients); N.Y.Mental Hyg. Law § 33.13(c) (McKinney 1996) (forbidding disclosure of information concerning the treatment of individual patients or clients of state mental health facilities or tending to identify such individuals except in certain enumerated circumstances); N.Y.Pub. Health Law § 2782 (McKinney 1993 & Supp.1997–98) (restricting disclosure of confidential HIV-related information obtained in the course of providing any health or social service); N.Y.Soc.Serv. Law § 136 (McKinney 1992) (requiring that welfare records and communications between social service employees and persons receiving public assistance be kept confidential).

1995.[2] On March 18, 1996, ACS issued Executive Order 101 ("ACS 101"), a policy similar to HRA Executive Order 634. On July 12, 1996, HRA replaced Executive Order 634 with Executive Order 641 ("HRA 641"). ACS 101 and HRA 641 contain essentially the same terms. In relevant part, ACS 101 provides,

> Given the importance of the functions performed by ACS, the legal mandates protecting the confidentiality of its clients, and the sensitivity of its activities, the operations of the Agency are particularly vulnerable to disruptions which might occur as the result of inappropriate dissemination of information concerning its policies and activities. Therefore, communications with the media must be coordinated to assure that the Agency is able to fulfill its mission effectively, and within the legally imposed requirements of confidentiality. For this purpose, the ACS Media Relations Office has been designated ACS's principal avenue of communications with the press.

> All contacts with the media regarding any policies or activities of the Agency—whether such contacts are initiated by media representatives or by an Agency employee—must be referred to the ACS Media Relations Office before any information is conveyed by an employee or before any commitments are made by an employee to convey information. The ACS Media Relations Office will determine the appropriate manner in which to handle media contacts regarding Agency policies or activities, including the appropriate person or persons to make such contacts, consistent with the efficient and effective operation of the Agency and the achievement of its objectives.

The City argues that its media contacts policies are necessary to prevent the public disclosure of information the City is legally required to keep confidential. The City contends that these policies are the most effective way for the City to ensure that inexperienced employees do not inadvertently reveal confidential information to the press. Additionally, the City urges that the policies promote the effective and efficient operation of the agencies by coordinating all agency contacts with the media.

## B. Harman's Alleged Violation of the Media Contacts Policy

In November 1995, the ABC news program World News Tonight contacted plaintiff Rosalie Harman, who at the time was a supervisor at CWA. ABC was interested in interviewing Harman regarding the death of six-year-old Elisa Izquierdo, allegedly as a result of a beating by her mother. The incident had become the subject of intense media scrutiny when it was revealed that CWA had received numerous reports about Elisa before her death. Harman agreed to speak with ABC, which interviewed her off CWA premises during her lunch hour on November 29, 1995.

That evening, ABC broadcast its report and included footage of Harman's interview. Without identifying her by name, the program showed Harman making the statement, "The workers who are considered the best workers are the ones who seem to be able to move cases out quickly." She also said, "There are lots of fatalities the press doesn't know anything about."

On January 12, 1996, Harman was informed that she was being suspended because of her statements to ABC News. The City based her suspension on her alleged violation of HRA Executive Order 634. On February 5, 1996, Harman filed the instant action. Among other allegations, she charged that the City had improperly retaliated against her for her constitutionally protected speech on a matter of public concern. In her complaint, she sought a temporary restraining order, a declaration that the media policy was unconstitutional as applied, a

---

**2.** Executive Order 634 provided, in pertinent part,

> All media inquiries and requests for interviews must be referred to the HRA Media Relations Office....

> If a reporter calls an HRA office, that call should be referred to Media Relations before any information is conveyed and/or before any commitments are made. It is *not* appropriate to indicate willingness to speak with a reporter until the conversation is cleared through Media Relations.

preliminary and permanent injunction against its enforcement, immediate reinstatement with backpay, and damages.

Before the hearing on Harman's motion for a preliminary injunction, the City agreed to reinstate her, to pay her backpay for the duration of her suspension, and to cancel all disciplinary proceedings against her. However, the constitutionality of Executive Order 634 and Harman's damages claim remained unresolved. In the meantime, as a result of the creation of ACS (Administration for Children's Services), Harman was transferred from HRA to ACS.

On April 12, 1996, Harman moved for partial summary judgment on the issue of the constitutionality of ACS 101, the executive order to which she was subject at the time. The City cross-moved for partial summary judgment. On June 20, 1996, the court allowed plaintiff Diane Stadler to intervene in the action. Stadler, like Harman, was employed as an ACS supervisor and was subject to ACS 101. She claimed that she wished to speak to the press and others regarding important issues such as the welfare of the children and families served by ACS, but that she was chilled and deterred from doing so by the existence and threat of enforcement of Executive Order 101. Stadler's intervenor complaint included both a facial and an as-applied challenge to ACS 101 under the First and Fourteenth Amendments to the United States Constitution and article I, section 8 of the New York State Constitution.

Thereafter, Harman transferred back to HRA, preserving the controversy over the HRA media policy. However, HRA Executive Order 634 had in the interim been superseded by HRA Executive Order 641. Because HRA 641 was identical in all material respects to ACS 101, the parties agreed that no additional briefing was required for the court to determine the constitutionality of both orders on the cross motions for partial summary judgment.

On November 26, 1996, the district court held that both executive orders were unconstitutional to the extent they required ACS and HRA employees to obtain agency approval before speaking with the press. *Harman v. City of New York*, 945 F.Supp. 750,

767–68 (S.D.N.Y.1996). On March 10, 1997, the City settled Harman's remaining claim for damages. The district court entered its final judgment on March 19, 1997, enjoining enforcement of ACS Executive Order 101 and HRA Executive Order 641. The City appeals pursuant to 28 U.S.C. § 1291.

## II. DISCUSSION

Individuals do not relinquish their First Amendment rights by accepting employment with the government. *See Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). However, the Supreme Court has recognized that the government "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *United States v. National Treasury Employees Union*, 513 U.S. 454, 465, 115 S.Ct. 1003, 1012, 130 L.Ed.2d 964 (1995) (*"NTEU"*). In evaluating the validity of a restraint on government employee speech, courts must "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35.

Pickering's balancing test applies only when the employee speaks "as a citizen upon matters of public concern" rather than "as an employee upon matters only of personal interest." *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). The government does not have to justify in court every disciplinary action taken in response to an employee's private speech regarding personal matters, such as a change in duties. *Id.* However, where the employee speaks on matters of public concern, the government bears the burden of justifying any adverse employment action. *See Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987).

The challenged policies here regulate employee speech concerning the policies and practices of two of New York City's largest social service agencies. These regulations

clearly aim at speech that is of considerable importance to the public. Indeed, discussion regarding current government policies and activities is "perhaps the paradigmatic 'matter[ ] of public concern.'" *Sanjour v. Environmental Protection Agency*, 56 F.3d 85, 91 (D.C.Cir.1995) (in banc) (alteration in original) (striking down a regulation that prohibited government employees from being reimbursed for their expenses when undertaking unofficial speaking or writing activities relating to their official duties). The record of this case demonstrates the sort of commentary that falls within the purview of the challenged policies. *See, e.g., NTEU*, 513 U.S. at 466, 115 S.Ct. at 1013 (examining speech engaged in prior to the adoption of a prospective regulation as an example of the kind of speech that could be curtailed by the regulation). Here, Harman was disciplined for stating to the press that "the workers who are considered the best workers are the ones who seem to be able to move cases out quickly," and, "there are lots of fatalities the press doesn't know anything about." This speech, concerning the priorities and effectiveness of the CWA, is obviously of interest to the public whom the agency serves. Therefore, the City bears the burden of demonstrating that the challenged policies are necessary to the efficient operation of the agencies.

■ This burden is particularly heavy where, as here, the issue is not an isolated disciplinary action taken in response to one employee's speech, but is, instead, a blanket policy designed to restrict expression by a large number of potential speakers. To justify this kind of prospective regulation, "[t]he Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU*, 513 U.S. at 468, 115 S.Ct. at 1014 (quoting *Pickering*, 391 U.S. at 571, 88 S.Ct. at 1736).

■ Additionally, we note that although the Plaintiffs raised a facial challenge to the press policies, the district court correctly concluded that under the *Pickering/NTEU* test the distinction between facial and as-applied constitutional challenges becomes unimportant. *See, e.g., Sanjour*, 56 F.3d at 92 (noting that the *NTEU* test, which requires a reviewing court to go beyond the facts of the case before it in considering the interests of "'a vast group'" of both present and future employees as well as the interests of "'potential audiences'" in "'a broad range of present and future expression,'" presumably applied to both types of challenge (quoting *NTEU*, 513 U.S. at 468, 115 S.Ct. at 1014)); *see also Weaver v. United States Information Agency* 87 F.3d 1429, 1440 (D.C.Cir. 1996) (finding traditional prior restraint analysis inappropriate where the government acts under its special authority as an employer), *cert. denied,* —— U.S. ——, 117 S.Ct. 2407, 138 L.Ed.2d 174 (1997). However, the concerns that lead courts to invalidate a statute on its face may be considered as factors in balancing the relevant interests under *Pickering. See, e.g., NTEU*, 513 U.S. at 468, 115 S.Ct. at 1014 (relying on prior restraint precedent to find a regulation of employee speech invalid under a modified *Pickering* test); *Weaver*, 87 F.3d at 1440 (stating that the detriments of prior restraints were among the factors to be considered in applying the *Pickering* test to a regulation requiring prepublication review of employee articles).

## A. The Interests of Harman, Stadler, and the Public

■ Plaintiffs Harman and Stadler both possess interests, as citizens, in being able to comment on matters of public concern. These interests go to the core of the freedoms the First Amendment was designed to protect. *See, e.g., Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957) (stating that the First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people"); *Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government."). While the government has special authority to proscribe the

speech of its employees, "[v]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." *Rankin,* 483 U.S. at 384, 107 S.Ct. at 2896.

■ A restraint on government employee expression "also imposes a significant burden on the public's right to read and hear what the employees would otherwise have written and said." *NTEU,* 513 U.S. at 470, 115 S.Ct. at 1015. The Supreme Court has noted that "[g]overnment employees are often in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions." *Waters v. Churchill,* 511 U.S. 661, 674, 114 S.Ct. 1878, 1887, 128 L.Ed.2d 686 (1994) (plurality opinion); *see also Sanjour,* 56 F.3d at 94. In *Pickering,* which concerned a teacher's published complaints about the school board's allocation of funds, the Court stated:

> On such a question free and open debate is vital to informed decision-making by the electorate. Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.

*Pickering,* 391 U.S. at 571–72, 88 S.Ct. at 1736.

Here, there is an ongoing public debate about the effectiveness of the City's child welfare agency. Experienced case-management supervisors such as Harman and Stadler can contribute valuable insights to the discussion. Harman's comments concerning the City's priorities in evaluating child welfare case managers, for example, illuminate potential problems in the management · of that agency. Both Harman and Stadler have indicated in their affidavits a desire to continue contributing to the public debate. The public has a significant interest in hearing their comments and those of other employees concerning the workings of the city's social service agencies.

■ However, neither the Plaintiffs nor the public has any protected interest in releasing statutorily confidential information. Given the network of laws forbidding the dissemination of such information, Plaintiffs wisely concede this point. Therefore, we evaluate the interests of employees and of the public only in commenting on non-confidential agency policies and activities.

■ The City contends that ACS 101 and HRA 641 do not infringe upon these interests. The City admits that the policies restrain employee speech in that they require prepublication review by the agency of any information an employee intends to convey to the media, and that the agency determine the proper way to handle the proposed media contact. However, the City asserts that the agencies will not prohibit employees from commenting on the non-confidential operations of the agency once they have ensured that the proposed speech is consistent with the efficient and effective operation of the agency.

Even according to this interpretation, the regulations clearly interfere with employees' ability to communicate their views to the media. Under ACS 101 and HRA 641, the government has the authority to prohibit speech altogether and to decide which employees may have contact with the media. In this way, these policies are broader than the honoraria ban struck down in *NTEU.* Whereas that regulation placed a burden on employee speech by denying compensation, the press policies here directly regulate speech.

■ The kind of approval procedure mandated by the City is generally disfavored under First Amendment law because it "chills potential speech before it happens." *NTEU,* 513 U.S. at 468, 115 S.Ct. at 1014. The press policies allow the agencies to determine in advance what kind of speech will harm agency operations instead of punishing disruptive remarks after their effect has been felt. For this reason, the regulations run afoul of the general presumption against prior restraints on speech. *See Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 559, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448

(1975) ("[A] free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand."). This aspect of the regulations weighs against the government in the *Pickering/NTEU* balance.

The power to suppress speech in advance also distinguishes the instant case from *Weaver.* In *Weaver,* the D.C. Circuit upheld a regulation requiring employees of the United States Information Agency to submit all teaching, writing, and speaking materials relating to matters of "official concern" to the agency for review before publication. *Weaver,* 87 F.3d at 1431. The majority accepted the government's narrowing construction of the regulation as allowing the agency only to advise employees of potentially inaccurate or disruptive statements, but not to grant any authority to prohibit publication or to punish an employee for publishing materials which had been found offensive under pre-publication review. *Id.* at 1439. The majority noted, however, that if the regulation were read to authorize punishment or suppression of speech in advance, as the regulations in this case clearly do, then the regulation would "raise serious constitutional issues." *Id.* at 1436.

Furthermore, we agree with the dissent in *Weaver* that a preclearance requirement may have a broad inhibiting effect on all employees, even those who might ultimately receive permission to speak. *See id.,* 87 F.3d at 1444 (Wald, J., dissenting). First, as the district court noted, preclearance requirements pose risks of "self-censorship by speakers in order to avoid being denied a license to speak." *City of Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, 759, 108 S.Ct. 2138, 2145, 100 L.Ed.2d 771 (1988). Employees who are critical of the agency will naturally hesitate to voice their concerns if they must first ask permission from the very people whose judgments they call into question. Only those who adhere to the party line would view such a requirement without trepidation. *See, e.g., Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 390, 93 S.Ct. 2553, 2561, 37 L.Ed.2d 669 (1973) ("The special vice of a prior restraint is that com-

munication will be suppressed, either directly or by inducing excessive caution in the speaker...."); *cf. Weaver,* 87 F.3d at 1455 (Wald, J., dissenting) ("[T]he very *purpose* of the [preclearance] regulation is to induce 'caution in the speaker.'" (quoting *Pittsburgh Press,* 413 U.S. at 390, 93 S.Ct. at 2561)).

Second, the prior approval mechanism allows the agencies to control the timing of the intended speech. By delaying the review process, the employer has the power to destroy the immediacy of the comment on agency affairs, and thus, in many cases, its newsworthiness. In such cases, "dissemination delayed may prove tantamount to dissemination denied." Laurence H. Tribe, American Constitutional Law 1042 (2d ed. 1988); *see also Freedman v. Maryland,* 380 U.S. 51, 59, 85 S.Ct. 734, 739, 13 L.Ed.2d 649 (1965) (noting the deterrent effect of delay in the review process).

Finally, the regulations raise concerns because they leave "the determination of who may speak and who may not ... to the unbridled discretion of a government official." *City of Lakewood,* 486 U.S. at 763, 108 S.Ct. at 2147. Outside the *Pickering* context, courts have mandated that regulations that impose licensing requirements on speech must possess "narrow, objective, and definite standards" to guide the decision-maker. *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 151, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969). Without such standards, a licensing regulation "raises the specter of content and viewpoint censorship." *City of Lakewood,* 486 U.S. at 763, 108 S.Ct. at 2147. In the context of the *Pickering/NTEU* balance, courts have found that the potential for censorship in a regulation "justifies an additional thumb on the employees' side of [the] scales." *Sanjour,* 56 F.3d at 97.

▆ The City contends that employee speech will be permitted as long as it will not interfere with the efficient and effective operations of the agencies. We do not find this standard to be sufficiently definite to limit the possibility for content or viewpoint censorship.[3] Because the press policies allow

---

3. Although the Supreme Court upheld a similar    standard in *Arnett v. Kennedy,* 416 U.S. 134, 94

suppression of speech before it takes place, administrators may prevent speech that would not actually have had a disruptive effect. *See, e.g., NTEU,* 513 U.S. at 475 n. 21, 115 S.Ct. at 1017 n. 21 ("Deferring to the Government's speculation about the pernicious effects of thousands of articles and speeches yet to be written or delivered would encroach unacceptably on the First Amendment's protections."). Furthermore, the standard inherently disfavors speech that is critical of agency operations, because such comments will necessarily ·seem more potentially disruptive than· comments that "toe[ ] the agency line." *Sanjour,* 56 F.3d at 96–97 (striking down regulation that permitted reimbursement for only those speaking engagements consistent with the "mission of the agency" as a restriction on anti-government speech).

The challenged regulations thus implicate all of the above concerns. By mandating approval from an employee's superiors, they will discourage speakers with dissenting views from coming forward. They provide no time limit for review to ensure that commentary is not rendered moot by delay. Finally, they lack objective standards to limit the discretion of the agency decision-maker. For these reasons we agree with the district court that "ACS 101 and HRA 641 clearly restrict the First Amendment rights of City employees." *Harman,* 945 F.Supp. at 764. We turn now to consideration of whether the City's posited interests are significant enough to outweigh the free speech interests of Harman, Stadler, and the public.

## B. The Government's Interests

### 1. Protecting Confidentiality

▆ The City asserts that the challenged press policies are necessary to protect the confidentiality of the· agencies' cases and clients. While Plaintiffs do not assert any interest in releasing such information, the City contends that prior review is necessary to ensure that confidential information is not inadvertently released to the public. In support of the City's summary judgment motion ACS Commissioner Scoppetta submitted an affidavit which stated that:

> The confidentiality of the agency's clients and records cannot be maintained simply by reminding employees of their responsibilities under the confidentiality laws. Nor can confidentiality adequately be served by disciplining employees only when confidential information is divulged, after the damage has been done both to the client and to the agency. On the contrary, the statutory mandate of confidentiality requires [ACS] to take proactive efforts to coordinate its communications with the public, including the media, on matters regarding agency policies and activities. This is necessary to prevent breaches of confidentiality.[4]

▆ Under the *NTEU* test, where the government singles out expressive activity for special regulation to address anticipated harms, the government must " 'demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.' " *NTEU,* 513 U.S. at 475, 115 S.Ct. at 1017. (quoting *Turner Broad. Sys., Inc. v. Federal Communications Comm'n,* 512 U.S. 622, 624, 114 S.Ct. 2445, 2450, 129 L.Ed.2d 497 (1994) (plurality opinion)). Although government predictions of harm are entitled to greater deference when used to justify restrictions on employee speech as opposed to speech by the public, such deference is generally accorded only when the

S.Ct. 1633, 40 L.Ed.2d 15 (1974) (plurality opinion) against a vagueness and overbreadth challenge, that case is distinguishable. The regulation at issue in *Arnett* allowed termination of federal employees for "such cause as will promote the efficiency of the service." *Id.* at 140, 94 S.Ct. at 1637 (quoting 5 U.S.C. §˙7501(a) (1970)). Because the regulation was a mechanism for punishment after speech had occurred, it did not implicate the same prior restraint concerns as the regulations at issue here. *See NTEU,* 513 U.S. at 467 n. 12, 115 S.Ct. at 1013

n. 12 (distinguishing *Arnett* as concerning a "a general statute's post-hoc application to a single employee's arguably unprotected speech" as opposed to a proscriptive regulation of the speech of all employees).

4. The City did not provide any independent justifications for the HRA policy, except to state that "[t]he reasoning applicable to ACS ... is equally applicable to HRA."

government takes action in response to speech which has already taken place. *NTEU*, 513 U.S. at 475 n. 21, 115 S.Ct. at 1017 n. 21.[5] Where the predictions of harm are proscriptive, the government cannot rely on assertions, but must show a basis in fact for its concerns. *See Sanjour*, 56 F.3d at 98–99.

The need to protect confidential information relating to children and families is undeniably significant. Not only could disclosure of such information injure the reputation and security of those the agencies serve, but a failure to maintain confidentiality may undermine public confidence in the agency. Citizens may hesitate to report troublesome situations or to seek public assistance if they cannot rely on the agencies to keep such information secret.

Protection of sensitive information has been held to justify prepublication review of employee expression in the past. For example, in *Snepp v. United States*, 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (per curiam), the Supreme Court upheld the CIA's right to review employee-written material relating to intelligence activities even if the materials did not contain classified information. The Court found that "[w]hen a former agent relies on his own judgment about what information is detrimental, he may reveal information that the CIA—with its broader understanding of what may ex-

pose classified information and confidential sources—could have identified as harmful." *Id.* at 512, 100 S.Ct. at 766.

However, that case concerned materials "essential to the security of the United States and—in a sense—the free world." *Id.* at 512 n. 7, 100 S.Ct. at 767 n. 7. Courts traditionally grant great deference to the government's interests in national defense and security. *See, e.g., Brown v. Glines*, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980) (upholding a preclearance requirement for all petitions circulated on an air force base as restricting no more speech than was necessary to protect military effectiveness); *accord Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976); *see also* James L. Oakes, *The Doctrine of Prior Restraint Since the Pentagon Papers*, 15 U.Mich.J.L. Reform 497, 512–16 (1982) (discussing the national security exception to the prior restraint doctrine). Indeed, no court has upheld a prior approval process as intrusive as those challenged in this case for any asserted government interest except the need to protect the national security.[6] *See, e.g., Fire Fighters Ass'n, Dist. of Columbia v. Barry*, 742 F.Supp. 1182, 1195 n. 25 (D.D.C.1990) (rejecting a comparison between a fire department and a military agency in striking down press policy requiring fire fighters to obtain permission before giving on duty interviews); *see also Latino Officers Ass'n v.*

---

**5.** The Supreme Court has deferred to Congress' proscriptive predictions of harm in upholding a provision of the Hatch Act, 5 U.S.C. § 7324(a)(2) (1994). *See United Public Workers v. Mitchell*, 330 U.S. 75, 100–01, 67 S.Ct. 556, 569–70, 91 L.Ed. 754 (1947) (accepting Congress's judgment that the efficiency of the public service is best protected by prohibiting partisan political activity among all classified federal employees). However, the Hatch Act primarily regulated conduct as opposed to expression. *See id.* at 100, 67 S.Ct. at 569. Moreover, the *NTEU* Court distinguished *Mitchell*, noting that the Hatch Act aimed to protect employees' expressive rights by removing pressure for government employees to perform political chores to curry favor with their superiors. The Court suggested that statutes passed to protect the speech rights of employees "provide[] much stronger justification for a proscriptive rule" than do statutes passed solely to advance the government's interests as employer. *NTEU*, 513 U.S. at 475 n. 21, 115 S.Ct. at 1017 n. 21. Because the regulations at issue here directly regulate speech for reasons unrelated to

protecting the expressive rights of employees, we do not accord deference to the City's assertions of anticipated harm. Additionally, we note that executive orders such as those at issue here are entitled to less deference than legislative determinations such as the Hatch Act. *Cf. id.* at 468, 115 S.Ct. at 1014 (stating that congressional judgments are entitled to "a stronger presumption of validity" than the disciplinary action of an individual executive).

**6.** In *Weaver*, the D.C. Circuit upheld a United States Information Agency prepublication review process designed to protect against inadvertent disclosure of classified and other sensitive information affecting the foreign relations of the United States. *Weaver*, 87 F.3d at 1433–34. While the information sought to be protected in *Weaver* was not as critical to national security interests as that in *Snepp*, neither was the review requirement as onerous, since the agency had no authority to prohibit publication of materials it found offensive.

*Safir,* No. 97 Civ. 3143, 1997 WL 426099, at *9, *12 (S.D.N.Y. July 30, 1997) (granting a preliminary injunction to enjoin enforcement of a police department regulation restricting the ability of officers to comment publicly on matters concerning the department). The confidentiality interests protected in this case, while significant, do not present as compelling a justification for the suppression of important First Amendment interests as those asserted in *Snepp.*

Furthermore, the City has not demonstrated that the asserted harms are real, rather than conjectural. In *Snepp,* an employee had published a manuscript without agency approval. The Director of the CIA testified without contradiction that that book and others like it had impaired the effectiveness of intelligence operations by making sources and other intelligence agencies more reluctant to share information with the CIA. In this case, the City has not demonstrated any actual harm to have resulted from Harman's unauthorized interview with ABC. Nor has the City shown that the agencies have a genuine problem with inadvertent employee disclosure of confidential information. The few articles cited by the City in which anonymous sources disclosed confidential information do not provide evidence of such a problem, since the articles do not reveal whether employees were the sources of the disclosures, much less that the disclosures were inadvertent. Nor has the City even attempted to demonstrate that members of the public have been deterred from reporting troublesome situations by the fear of disclosure. While it is obviously difficult to present evidence regarding reports that have not been made, the City cannot justify broad restrictions on First Amendment rights by supposition alone. *See NTEU,* 513 U.S. at 475, 115 S.Ct. at 1017 (" 'Fear of serious injury cannot alone justify suppression of free speech....' " (quoting *Whitney v. California,* 274 U.S. 357, 376, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring))); *cf. Reno v. ACLU,* — U.S. ——, ——, 117 S.Ct. 2329, 2351, 138 L.Ed.2d 874 (1997) ("The interest in encouraging freedom of expression in a democratic society outweighs any theoretical but unproven benefit of censorship.").

More importantly, the City has not shown that the executive orders are designed to address the asserted harm in a "direct and material way." The City contends that to meet its obligations under state statutes to protect the confidentiality of specific information, its agencies must pre-screen all communications to the press regarding "any policies or activities" of the agencies. This sweeping prior restraint mechanism is overbroad. The statutes and regulations cited by the City require that identifying information and communications regarding individuals served by some of the City's social service programs be kept confidential. The executive orders reach much more broadly to cover all information regarding any agency policy or activity. They thus have the potential to chill substantially more speech than is reasonably necessary to protect the confidential information. *See, e.g., Wolf v. City of Aberdeen,* 758 F.Supp. 551, 555 (D.S.D.1991) (finding a city ordinance that forbade employees from commenting on internal business decisions and departmental rules without first obtaining permission unconstitutionally overbroad in relation to the city's asserted interest in protecting confidential information); *cf. Sanjour,* 56 F.3d at 95 (striking down a prospective regulation where there was an "obvious lack of 'fit' between the government's purported interest and the sweep of its restrictions").

Indeed, while state law requires ACS to take reasonable measures to protect the confidentiality of the information, it also allows the ACS Commissioner to release such information at his discretion. The legislature created this exception expressly for the purpose of increasing public oversight of ACS operations. The City contends that because the Commissioner must notify the Mayor before releasing any such information, it would be anomalous to allow rank and file employees to speak to the press without having to notify their superiors at the agency. We do not agree that this conclusion follows. The legislature has chosen to grant the Commissioner discretion only over the release of confidential information. No law gives ACS officials discretion over the release of any information pertaining to policies or activities of the agency. Therefore, as the law currently

stands, no statute or regulation requires the kind of blanket supervision of all employee contacts with the media that the press policies set out.

This is not to say that any policy that restricts speech beyond the information statutorily required to be kept confidential could not withstand constitutional scrutiny. Given the City's compelling interest in protecting such information, a less burdensome regulation may well survive the *Pickering/NTEU* balancing test. We hold only that the City has not met its burden to justify the comprehensive sweep of the policies at issue here.

### C. Efficient and Effective Operation of the Agencies

■ The final interest asserted by the City is its need to promote the efficient and effective operation of the City agencies. The government's interest in functioning as effectively as possible has been found to justify restrictions on employee speech. *See Waters,* 511 U.S. at 675, 114 S.Ct. at 1888; *Connick,* 461 U.S. at 150–53, 103 S.Ct. at 1692–3. However, the City bears the same burden here to show that allowing employees unchecked access to the media would actually harm the effectiveness of the two city agencies, and that the challenged media policies address this harm in "a direct and material way."

As briefed to this Court, the City's asserted interest in promoting efficiency is essentially a corollary to the City's interest in protecting confidential information. The City contends that the efficient operation of the agencies depends on keeping certain information about clients and informants confidential. Secondarily, the City argues that the effectiveness of the agencies will be promoted by allowing media officers to notify employees if their statements to the press would be viewed by the agency as disruptive, and, in cases where the employee is permitted to speak to the press, to provide the employee with additional relevant information to impart a more accurate picture of agency policies or activities.

The City fails to meet its burden here as well. As to confidentiality, the City again has not demonstrated that agency operations have been or will be impacted by inadvertent disclosure of confidential information by employees. As to the City's interest in advising employees before they speak to the media, these interests are insufficient to justify prior approval of employee speech. To the extent employees would prefer to know in advance whether their speech will be viewed as disruptive, they may voluntarily seek advance review by the agency's media relations department. The agency is also free to provide notice to employees by making specific rules or providing examples of the kinds of remarks that might subject an employee to discipline. However, a blanket approval process suppresses substantially more speech than is necessary to accomplish this aim. Similarly, the agencies' asserted need to provide employees with "additional information" before they speak to the press amounts to mere convenience, and is not the kind of justification that can outweigh the employees' and the public's interest in allowing free-wheeling debate on matters of public concern.

### CONCLUSION

■ For the above reasons, we affirm the holding of the district court, and find Executive Orders 101 and 641 to be unconstitutional infringements on the First Amendment rights of city employees.