964 A.2d 811 (2009)
405 N.J. Super. 336
In the Matter of the DISCIPLINARY ACTION AGAINST Detective Ariel GONZALEZ.
No. A-1392-07T3.
Superior Court of New Jersey, Appellate Division.
Submitted October 29, 2008.
Decided February 25, 2009.
*813 Loccke, Correia, Schlager, Limsky & Bukosky, Hackensack, for appellant Ariel Gonzalez (Gregory G. Watts, on the brief).
Jon S. Deutsch, General Counsel, for respondent Waterfront Commission of New York Harbor (Brian M. McCann, of counsel and on the brief).
Before Judges A.A. RODRÍGUEZ, PAYNE and WAUGH.
The opinion of the court was delivered by
PAYNE, J.A.D.
Ariel Gonzalez, a Detective employed by the Waterfront Commission of New York Harbor, an instrumentality of the *814 states of New York and New Jersey,[1] appeals from the Commission's final determination that he violated the Commission's Media and Public Relations Policy by contacting a reporter at NBC-TV to inform him of an allegedly unsafe and hazardous condition at Gonzalez's workplace arising from the presence of dead rats in what Gonzalez believed to be a contaminated three-year-old dirt pile located in the Commission parking lot. A penalty of a ten-day suspension without pay was imposed upon Gonzalez as the result of this infraction. On appeal, Gonzalez argues that the Commissions' Media Policy is facially unconstitutional, and that the discipline imposed on him, based upon that policy, was unlawful.[2] Gonzalez, the President of the Detectives Endowment Association, Inc., P.B.A. Local 195, argues additionally that his conduct constituted protected union activity for which he could not be disciplined.

I.
Our recitation of the facts of this matter is based upon the record of an administrative hearing conducted by a New York Administrative Law Judge[3] following the service of charges upon Gonzalez, at which Jon S. Deutsch, General Counsel for the Commission, and Gonzalez gave testimony. The record discloses that Gonzalez, hired as a detective by the Commission eight years earlier, had from the outset of his employment been active in the union, occupying the positions of recording secretary, vice-president and, since 2005, president.
The record suggests that, when hired, Gonzalez was informed of the Commission's media policy, which provides in relevant part:
The Employees' Manual places the responsibility for handling "public relations" in the Office of the Executive Director. Accordingly, all contact with the media (including but not limited to the press, television and radio) will be conducted under the supervision of the Executive Director. It is the policy of the Commission that any information released to the media be accurate, be in the public interest and not compromise the agency or any investigation. To ensure the above, the following guidelines will be followed by all members of the staff:
* * *
2. No staff member shall initiate contact with the media without prior approval of the Executive Director.
Deutsch explained the reason for the policy in the following terms:
The main reason is that one voice must speak for the Commission. Additionally, there are numerous divisions, as I stated, within the Commission. Unfortunately, the Chief of Police, for example, may not know, he may want to speak about something, but he may not know that the Director of Licensing is working on something which also affects that investigation. So, bottom line, it's *815 everybody being on the same page. And, unfortunately, many times each director is not aware of what someone else may be doing within the Commission.
Deutsch testified further that "there are no exceptions" to the written policy, but he acknowledged that an employee could offer a private opinion to the media regarding the performance of the Yankees and, perhaps, the Mets without invoking discipline. He later testified that whether a violation of the policy had occurred was a fact-sensitive matter, and both the content of the communication and whether the person making the communication identified himself as a Waterfront Commission employee were significant factors in determining whether a violation had occurred.
Throughout his employment, Gonzalez worked at offices located at 117 Tyler Street, Port Newark that were owned by the City of Newark, leased to the Port Authority of New York and New Jersey, and subleased to the Commission. Although Deutsch testified that the building was "habitable," it was not a "nice work place," and he was aware of complaints of rats in and around the premises. As a consequence of the building's failings, extended negotiations between the Port Authority and the Commission had taken place with the aim of leasing a more appropriate office location. The existing building housed both the Commission's Police Division and its Licensing Division, which also served as an employee information center for longshoremen. According to Deutsch, the location "is pretty much a walk-up building" where longshoremen, stevedores and hiring agents come with questions. Gonzalez confirmed that the public came in and out of the building, and would be exposed to any hazards that were present.
Approximately three years earlier, the Commission had removed a gasoline fuel tank from the parking lot in an area immediately adjacent to property owned by P & O Ports. The tank had been installed by the Commission for the use of Commission employees. Upon removal, a black sludge-like material started seeping into the hole where the tank had been located, raising pollution concerns. The Commission's environmental consultants advised that the Commission should safely dispose of the dirt that had been in the hole and that the hole should be filled with clean material. The Department of Environmental Protection (DEP) was advised of the sludge, but testing disclosed only trace amounts of volatile organic compounds (VOCs). The testing thus established that the tank had not leaked, but did not address the possible presence of other toxins in the sludge and excavated soil.
Deutsch testified that the Commission had not notified its employees of the sludge contamination but, eventually, problems with the soil had become common knowledge. Because a longstanding dispute between the Commission and the Port Authority existed regarding which entity would dispose of the excavated soil, the dirt pile had remained on site for almost three years. The soil removal issue was a component of the Commission's ongoing lease negotiations with the Port Authority.
Gonzalez testified that shortly after he assumed the position of union president, Commission employees commenced contacting him regarding the condition of the Tyler Street building. During the summer of 2005, complaints regarding the dirt pile and the presence of rats in the pile also were made. Photographs, introduced at the hearing, depicted three dead rats on or near the pile  a circumstance that led to Gonzalez's and fellow employees' concern that toxic substances in the dirt pile had led to the rats' death.
*816 At some point, Gonzalez wrote a letter to the Commission's Chief of Police, Brian Smith, to complain about the rats on behalf of his union members. On September 20, 2005, Gonzalez contacted union counsel, Michael Bukosky, for his advice as to how the union could protect its members from health hazards arising from conditions within the Tyler Street building and from the dirt pile. On September 27, 2005, Bukosky wrote to Deutsch, reporting that the building's main hall was littered with bird feces and that a Port Authority maintenance employee who had inspected the bathrooms had stated that they were contaminated with E. coli bacteria. Additionally Bukosky noted the removal of what he termed a "gas pump," and he stated: "The removers of the gas pump told PBA unit members that the excavated dirt was toxic and would have to be carted away by a specialized environmental company." Bukosky demanded that the Commission relocate the employees and/or "immediately ameliorate the hazardous conditions." Deutsch responded in a letter, dated November 16, 2005, stating that laboratory tests had been negative for E. coli and that an analysis of the soil was negative for the presence of VOCs.
Gonzalez testified that he was not satisfied with Deutsch's response. As a consequence, he directed Bukosky to request copies of the laboratory analyses, which Bukosky did by letter of November 30, 2005. On January 30, 2006, the results of the E. coli testing, only, were faxed to Bukosky. Because the response was incomplete, on March 30, 2006, Bukosky again requested a copy of the soil analysis. No response to his letter was received.
Gonzalez's suspicions were aroused by the Commission's failure to produce the requested soil analysis. As a consequence, Gonzalez contacted the federal Occupational Safety and Health Administration (OSHA), but was informed that it did not have regulatory authority over bi-state agencies. He contacted the DEP, and he was given an identifying number for his complaint, but no investigation occurred. Additionally, Gonzalez contacted the Newark Board of Health regarding the rat problem, without success.
Having failed to obtain a regulatory response, in early September 2006, Gonzalez contacted NBC-TV's Brian Thompson, identifying himself as the PBA's president, because he "didn't want Mr. Thompson to think that [he] was calling him as an employee of the Commission, as a Detective." Gonzalez testified that he knew what he was doing was "related to the press," so he "didn't want anybody thinking that [he] was representing the Commission in any way. [He] was representing [his] members, and not the Commission." Although Gonzalez contacted Thompson on behalf of his union's members, he confirmed at the hearing that the health and safety issues that he reported "absolutely" affected the general public and other waterfront workers who visited the site or worked in areas near the dirt pile, including employees of neighboring P & O Ports.
Thompson expressed interest in the matter and, on September 6, 2006, he appeared at the Tyler Street location with a cameraman. Nothing was ever aired as a result of the visit. However, the dirt pile was removed within a week, although Deutsch testified that the removal was "absolutely not" the result of the press attention. Gonzalez had not obtained authorization from Executive Director DeMaria to contact the press, and DeMaria was "shocked" when the reporter appeared at the site.
By letter dated February 27, 2007, Gonzalez was informed of the charges against him, and of a hearing to be conducted concerning the charges, at which time the *817 hearing officer would consider whether he violated the Collective Bargaining Agreement by
engag[ing] in conduct, in your public or private life, which is incompatible or creates the appearance of being incompatible or detrimental to your primary responsibility of rendering unbiased and efficient service as a member of a governmental agency by violating the Media and Public Relations Policy of the Waterfront Commission, in that: on or about September 3, 2006, you initiated contact with the media, without prior approval of the Executive Director.
In a written opinion issued following the hearing, the presiding administrative law judge concluded that the Commission had presented clear and convincing evidence that Gonzalez had violated the Commission's media policy, and he recommended a five-day suspension, without pay.[4] Although Gonzalez took the position at the hearing that his conduct was protected by the First Amendment, the judge did not address that issue, determining that he lacked the authority to decide constitutional matters. The Commission[5] affirmed the judge's factual conclusions, but increased the discipline to ten days without pay and stated in its decision that forfeiture of a portion of annual leave in lieu of the suspension would not be permitted. This appeal followed.

II.
On appeal, Gonzalez argues that the Commission's media policy is overbroad and, consequently, facially unconstitutional under the First Amendment. He also argues that it cannot constitutionally be utilized as a basis for disciplining him under the circumstances of this case. The Commission essentially side-steps Gonzalez' facial constitutional challenge and argues that, because Gonzalez was not speaking as a citizen on a matter of public concern, his speech was not constitutionally protected.
We have jurisdiction over this appeal from a final decision of a bi-state agency. See R. 2:2-3; Port Auth. TransHudson Corp. v. Baum Bus Co., 156 N.J.Super. 578, 384 A.2d 209 (App.Div. 1978); Pressler, Current N.J. Court Rules, comment 3.4.1 on R. 2:2-3 (2009). And, although our role in reviewing the actions of administrative agencies is limited, we are clearly empowered to determine whether an agency's decision offends the State or Federal Constitution. George Harms Const. Co. v. Turnpike Auth., 137 N.J. 8, 27, 644 A.2d 76 (1994); Campbell v. Dept. of Civil Serv., 39 N.J. 556, 562, 189 A.2d 712 (1963).
It is well-established that a public employee does not relinquish his or her First Amendment right to comment on matters of public interest, otherwise available to citizens, simply as the result of the fact of public employment. Pickering v. Bd. of Ed. of Twp. High School Dist. 205, Will County, 391 U.S. 563, 568, 88 S.Ct. *818 1731, 1734, 20 L.Ed.2d 811, 817 (1968); Karins v. City of Atlantic City, 152 N.J. 532, 548, 706 A.2d 706 (1998). Nonetheless,
it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.
[Pickering, supra, 391 U.S. at 568, 88 S.Ct. at 1734-35, 20 L.Ed.2d at 817.]
In Pickering and its progeny, the Supreme Court resolved the tension between First Amendment rights and employer interests by the adoption of a test that first looks to whether the employee's speech may be "fairly characterized as constituting speech on a matter of public concern." Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708, 719 (1983); Karins, supra, 152 N.J. at 549, 706 A.2d 706. If not, the First Amendment does not protect the employee from employer discipline, Garcetti v. Ceballos, 547 U.S. 410, 418, 126 S.Ct. 1951, 1958, 164 L.Ed.2d 689, 699 (2006); United States v. Nat'l Treasury Employees Union, 513 U.S. 454, 466, 115 S.Ct. 1003, 1013, 130 L.Ed.2d 964, 979 (1995); Connick, supra, 461 U.S. at 146-47, 103 S.Ct. at 1690, 75 L.Ed.2d at 719-20, nor does it permit the constitutionalization of otherwise private grievances. Garcetti, supra, 547 U.S. at 420, 126 S.Ct. at 1959, 164 L.Ed.2d at 700 (citing Connick, supra, 461 U.S. at 154, 103 S.Ct. at 1694, 75 L.Ed.2d at 725).
If public interest or concern is established, then the court must balance the employee's interest in free speech against the "government's interest in the effective and efficient fulfillment of its responsibilities to the public." Connick, supra, 461 U.S. at 150, 103 S.Ct. at 1691-92, 75 L.Ed.2d at 722; Karins, supra, 152 N.J. at 549, 706 A.2d 706. "A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations." Garcetti, supra, 547 U.S. at 418, 126 S.Ct. at 1958, 164 L.Ed.2d at 699. In balancing employee and employer interests in this context, courts must consider not only the content of the speech, but also the "manner, time, and place in which it is delivered." Connick, supra, 461 U.S. at 152, 103 S.Ct. at 1693, 75 L.Ed.2d at 723; Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 415 n. 4, 99 S.Ct. 693, 696 n. 4, 58 L.Ed.2d 619, 624 n. 4 (1979); Karins, supra, 152 N.J. at 550, 706 A.2d 706. Resolution of the issue of whether speech is protected is one of law. Connick, supra, 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7, 75 L.Ed.2d at 720 n. 7.
In a case such as this, in which a facial challenge is made to a blanket policy that has been alleged to constitute an overbroad prior restraint on free expression by governmental workers, the Commission's burden of justifying the restraint is greater than that existing if only an isolated disciplinary action is involved. Nat'l Treasury Employees, supra, 513 U.S. at 468, 115 S.Ct. at 1014, 130 L.Ed.2d at 980. "The Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's `necessary impact on the actual operation' of the Government." Ibid., 115 S.Ct. at 1014, 130 L.Ed.2d at 980-81 (quoting *819 Pickering, supra, 391 U.S. at 571, 88 S.Ct. at 1736, 20 L.Ed.2d at 819). Courts have determined that, under the Pickering/National Treasury Employees test, "the distinction between facial and as-applied constitutional challenges becomes unimportant." Harman v. City of New York, 140 F.3d 111, 118 (2d Cir.1998) (citing Sanjour v. Envtl. Protect. Agency, 56 F.3d 85, 92 (D.C.Cir.1995)); see also Davis v. N.J. Dept. of Law and Public Safety, Div. of State Police, 327 N.J.Super. 59, 71 n. 7, 742 A.2d 619 (Law Div.1999).
The Court has held, in the context of a challenge based on overbreadth, that: "It has long been recognized that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society." Broadrick v. Oklahoma, 413 U.S. 601, 611-12, 93 S.Ct. 2908, 2915, 37 L. Ed.2d 830, 839-40 (1973). In Broadrick, the Court recognized that claims of facial overbreadth "have been entertained in cases involving statutes which, by their terms, seek to regulate `only spoken words.'" Id. at 612, 93 S.Ct. at 2916, 37 L.Ed.2d at 840.
In such cases, it has been the judgment of this Court that the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted and perceived grievances left to fester because of the possible inhibitory effects of overly broad statutes.
[Ibid.]
As a result, enforcement of an overbroad statute or regulation is "totally forbidden until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." Id. at 613, 93 S.Ct. at 2916, 37 L.Ed.2d at 840-41.
This principle was applied in New Jersey, in the factually analogous case of Davis, supra, 327 N.J.Super. 59, 742 A.2d 619. In that case, Judge Parillo preliminarily enjoined enforcement of a State Police regulation mandating clearance and pre-approval of contacts by State Police members with the media, accepting the plaintiffs' argument that the regulation constituted an unconstitutional prior restraint on employees who wished to speak in their private capacities about non-confidential matters of public concern. In that opinion, the judge recognized that government "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." 327 N.J.Super. at 70, 742 A.2d 619 (quoting Nat'l Treasury Employees, supra, 513 U.S. at 465, 115 S.Ct. at 1012, 130 L.Ed.2d at 978-79). However, he cautioned:
In the exercise of such governmental authority, vigilance is necessary to ensure that public employers do not use their power over employees to silence discourse, "not because it hampers public functions but simply because superiors disagree with the content of employees' speech."
[Ibid. (quoting Harman, supra, 140 F.3d at 119.)]
In granting the injunction, Judge Parillo noted that the policy at issue failed to include "narrow, objective and definite standards" by which consent to speak would be governed. Id. at 77, 742 A.2d 619 (quoting Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150-51, 89 S.Ct. 935, 938, 22 L.Ed.2d 162, 167 (1969)). As a consequence, unbridled discretion was placed in the hands of a governmental official, raising the possibility of content *820 and viewpoint censorship and also permitting the agency to control the timing of employee speech. Id. at 77-78, 742 A.2d 619. The judge recognized: "Regulations... which condition the exercise of speech rights on the prior permission of a government official, constitute a prior restraint." Id. at 78, 742 A.2d 619 (quoting Fire Fighters Assoc., District of Columbia v. Barry, 742 F.Supp. 1182, 1194 (D.D.C. 1990)). And the judge noted a substantial number of decisions invalidating such regulations on First Amendment grounds. Id. at 79, 742 A.2d 619.[6]
We view the Commission's media policy, prohibiting employee contact with the media without the prior approval of the Commission's Executive Director, as functionally indistinguishable from those regulations invalidated on First Amendment grounds in the cases that we have just cited. In this instance, as in the decisions upon which we rely, the regulation acts as a prior restraint that is overbroad in its scope, potentially acting to chill comment by Commission employees, rendered in a private capacity, about non-confidential matters of public concern. Accordingly, we find the regulation to be unconstitutional on its face.`As we will discuss more fully, as follows, the Commission has failed to meet the heavy burden of justification imposed upon it by Nat'l Treasury Employees.
The record in this matter provides a clear illustration of the regulation's overbreadth. The matters upon which Gonzalez spoke  the potential toxicity of the dirt pile and the presence of dead rats on it  while of particular concern to Gonzalez and his unionized co-employees, were also matters of public concern. The record reflects Deutsch's concession that the Commission's offices, located adjacent to the dirt pile, could be characterized as a "walk-up building" frequented by longshoremen, stevedores and hiring agents as well as Commission employees. Additional port facilities, operated by P & O Ports, were in close proximity to the dirt pile. In these circumstances, it is reasonable to conclude that the hazardous conditions created *821 by the allegedly contaminated soil and the presence of live and dead rats in the area surrounding the dirt pile were of interest and concern to the public and Commission employees alike.
Thus, it is clear to us that Gonzalez did not speak just "as an employee upon matters only of personal interest" but rather as a citizen on a matter of public concern. Natn'l Treasury Employees, supra, 513 U.S. at 466, 115 S.Ct. at 1013, 130 L.Ed.2d at 979 (quoting Connick, supra, 461 U.S. at 147, 103 S.Ct. at 1690, 75 L.Ed.2d at 720). That Gonzalez possessed a personal stake in the removal of the contamination does not render the issues raised any less substantial. Davis, supra, 327 N.J.Super. at 74, 742 A.2d 619 (citing Rode v. Dellarciprete, 845 F.2d 1195, 1202 (3d Cir.1988)). NBC-TV's interest in Gonazlez's story provides additional, but not dispositive, confirmation of the appropriate nature of our characterization. Abad v. City of Marathon, Fla., 472 F.Supp.2d 1374, 1380 (S.D.Fla.2007) (noting that newspaper's determination to print firefighter's comments regarding quality of service provided further proof that the comments concerned matters of public interest).
Even if the Commission possessed studies demonstrating that the dirt at issue did not contain excess VOCs, those studies had not been disclosed, despite Gonzalez's determined efforts to obtain disclosure. Moreover, even if they had been disclosed, the studies did not address the potential presence of other toxic contaminants. Further, Gonzalez's additional concern regarding the presence of live and dead rats in the vicinity of the dirt pile remained unaddressed. As the court recognized in Int'l Ass'n of Firefighters Local 3233 v. Frenchtown Charter Twp., 246 F.Supp.2d 734, 738 (E.D.Mich.2003), a potential violation of state occupational health and safety laws is "of special public concern because it deals with a public agency's actions in accordance with the law."
Courts have concluded that a public employer has legitimate concerns regarding unauthorized employee communications with the press based upon interests such as: "(1) the need to maintain discipline or harmony among co-workers; (2) the need for confidentiality; (3) the need to limit conduct that impedes the public employee's proper and competent performance of his duties; and (4) the need to encourage close and personal relationships between employees and their superiors." Hall v. Mayor and Director of Public Safety in the Twp. of Pennsauken, 176 N.J.Super. 229, 232, 422 A.2d 797 (App.Div.1980); see also Pickering, supra, 391 U.S. at 568-73, 88 S.Ct. at 1734-37, 20 L.Ed.2d at 817-19 (listing as relevant factors confidentiality, the maintenance of discipline by immediate superiors, the preservation of co-worker harmony, the fostering of loyalty and confidence when necessary to the proper functioning of a particular working relationship, the promotion of efficiency in governmental operations, and the ability of the government to rebut false statements made by its employees without undue difficulty).
In its brief on appeal, the Commission asserts that its interest in "having one voice speak for it on waterfront matters to protect employee's security and the confidentiality of its investigations" outweighs any interest Gonzalez may have had in expressing his concerns. However, we are satisfied that Gonzalez's conduct did nothing to jeopardize that interest. Although he exposed a potentially dangerous condition for which the Commission sought to hold the Port Authority responsible, there is nothing in the record that would suggest that Gonzalez's actions in any manner adversely affected ongoing negotiations between the parties. In this *822 circumstance, we conclude that the Commission has failed to meet its burden of demonstrating a governmental interest in nondisclosure that would overcome Gonzalez's First Amendment rights, let alone the heavier burden imposed by Nat'l Treasury Employees. We have not been informed of other circumstances in which the Commission's media policy has been utilized to deter protected speech or utilized, unconstitutionally, as a basis for discipline. Nonetheless, we are mindful that health, safety and other concerns may form legitimate subjects of public interest upon which Commission employees have a right to comment in their private capacities.
We therefore conclude that the media policy at issue is overbroad, and thus unconstitutional on its face. We conclude, as well, that the policy was unconstitutionally applied in this case to sanction Gonzalez's conduct.
In light of our resolution of the constitutional issues raised by Gonzalez, we need not address his argument that his media contact constituted protected union activity.
The Commission's Media and Public Relations Policy is declared unconstitutional as overbroad insofar as it provides that "[n]o staff member shall initiate contact with the media without prior approval of the Executive Director" without providing "narrow, objective and definite standards" as to the scope of the prohibition. See Davis, supra, 327 N.J.Super. at 77, 742 A.2d 619. Additionally, the disciplinary sanction imposed on Ariel Gonzalez is vacated, and reimbursement of forfeited pay, with interest, is awarded.
NOTES
[1] The Commission's statutory mission is to investigate, deter, combat, and remedy criminal activity and influence in the Port of New York and New Jersey. See N.J.S.A. 32:23-2. It also ensures fair hiring and employment practices. See N.J.S.A. 32:23-5.
[2] The record in this matter does not reflect that notice was given to the Attorney General of either state pursuant to Rule 2:5-1(h).
[3] The collective bargaining agreement between the Waterfront Commission of New York Harbor and Detective's Endowment Association P.B.A. Local 195 provides for a hearing, conducted by an Administrative Law Judge, prior to discipline of a permanent employee. The partied do not explain why a New York judge was chosen to adjudicate a matter involving conduct that occurred in New Jersey.
[4] In his opinion, the judge rejected Gonzalez's position that he was immune from discipline because he had engaged in protected union activity. In doing so, the judge balanced Gonzalez's right to engage in arguably protected activity against the Commission's operational justification for its policy. He found that the Commission's interest in having one voice speak for it on waterfront matters, in order to protect employees' security and the confidentiality of its investigations, outweighed Gonzalez's interest in being able to contact the media to air a grievance, especially when alternate contractual and administrative avenues for relief existed.
[5] The decision was made by New York Commissioner Michael Axelrod. New Jersey Commissioner Michael Madonna recused himself.
[6] The judge cited Harman, supra, 140 F.3d 111 (requirement that employees obtain pre-approval by Media Relations Office of relevant city social service agency before making contacts with media was unconstitutionally overbroad); Latino Officers Ass'n v. Safir, 170 F.3d 167 (2d Cir.1999) (suggesting that if prior approval of speeches by members of the New York Police Department were required, it would be unconstitutional); Spain v. City of Mansfield, 915 F.Supp. 919 (N.D.Ohio 1996) (fire department rules requiring approval before assistant fire chiefs were permitted to speak out on fire department matters were facially unconstitutional); and Wolf v. City of Aberdeen, 758 F.Supp. 551 (D.S.D.1991) (municipal ordinance prohibiting city employees from commenting on internal business decisions or department rules and regulations without prior approval was unconstitutionally overbroad). See also, e.g., Abad, supra, 472 F.Supp.2d 1374 (fire department rule requiring prior approval of contacts with media was unconstitutionally applied to firefighter and union officer who wrote an editorial critical of understaffing and low wages); Int'l Ass'n of Firefighters Local 3233, supra, 246 F.Supp.2d 734 (ordinance designating fire chief as sole spokesman to media was facially unconstitutional); Wagner v. City of Holyoke, 100 F.Supp.2d 78 (D.Mass.2000) (rule barring release of information to the media by all but chief of police or his designee was unconstitutionally overbroad), aff'd, 404 F.3d 504 (1st Cir.), cert. denied, 546 U.S. 977, 126 S.Ct. 552, 163 L.Ed.2d 461 (2005); Salerno v. O'Rourke, 555 F.Supp. 750 (D.N.J.1983) (proscription against jail employee giving "information" to newspaper representatives or "any other person" without the consent of the sheriff is so overinclusive facially as to be unconstitutional); Ramirez v. County of Hudson, 167 N.J.Super. 435, 400 A.2d 1230 (Ch.Div.1979) (regulation prohibiting correctional employees from imparting information to newspaper reporters or others not officially connected with the Hudson County Jail or Penitentiary was unconstitutionally overbroad).