Lou MARINOFF Plaintiff,

v.

CITY COLLEGE OF NEW YORK; Zeev Dagan, personally and in his capacity as Provost of the City College of New York; John Snyder, personally and in his capacity as Dean for Faculty Relations of the City College of New York;

James F. Watts, personally and in his capacity as Acting Dean of Humanities of the City College of New York; Arthur J. Spielman, personally and in his capacity as Chair of the Human Subjects Committee of the Institutional Review Board of the City College of New York; John or Jane Doe, personally and in his/her capacity as officials of the City College of New York. Defendants.

No. 02 Civ. 224(SHS).

United States District Court, S.D. New York.

Feb. 17, 2005.

Colleen Meenan, Meenan & Associates, L.L.C., New York City, Peter W. Beadle, Amherst, NY, for plaintiff.

Kathryn C. Spann, Eliot Spitzer, New York City, for defendants.

*OPINION & ORDER*

STEIN, District Judge.

## Introduction

Plaintiff Lou Marinoff, a professor at the City College of New York, brings this action pursuant to 42 U.S.C. § 1983 seeking damages from several City College officials for alleged violations of his First Amendment rights. Specifically, Professor Marinoff alleges that defendants violated his First Amendment rights when they imposed a moratorium on his on-campus "philosophical counseling activities" pending a legal review of those activities.

Defendants now move for summary judgment. As set forth more fully below, the Court grants that motion for two reasons: First, the bulk of Marinoff's activities did not involve matters of public concern and therefore do not implicate the First Amendment. Second, with respect to that portion of his activities that did involve matters of public concern—his research—defendants did not violate the First Amendment by requiring Marinoff to temporarily cease his on-campus philosophical counseling activities while City College conducted its review of the legal issues involved.

## I. Background

### A. The Parties and the Nature of Philosophical Counseling

Marinoff is an associate professor at City College and a practitioner of "philosophical counseling." (Declaration of Lou Marinoff ¶¶ 1–2, 4). Philosophical counseling has both adherents and those who denigrate it. (*See* Joe Sharkey, *I Bill, Therefore I Am: Philosophers Ponder a Therapy Goldmine,* N.Y. Times, March 8, 1998, at § 4 p. 1, Exhibits to Pl.'s Response to Defs.' 56.1 Statement and Pl.'s Counter 56.1 Statement at 287). While "philosophical counseling" does not yield to a precise definition, what constitutes "philosophical counseling" is central to this case. According to Marinoff, philosophical counseling is "help[ing] people apply philosophy to their management and ... resolution of everyday problems." (Deposition of Louis Marinoff of May 21, 2004, at 95).

Philosophical counseling, according to Marinoff, is one branch of the broader field known as "philosophical practice." (Marinoff Dep. at 53–54). Philosophical practice in turn includes three primary sub-specialties: philosophical consulting, group facilitation, and philosophical counseling. (Marinoff Dep. at 53–58). In all three areas, the practitioner engages in philosophical dialogue with a client in order to help that client solve a problem. (Marinoff Dep. at 55–61. "Philosophical counseling mean[s] dialogue between two people...." *Id.* at 59. "[W]e as counselors ... would be dealing with clients who have to make a decision...." *Id.* at 61).

The difference between the three sub-specialties is the nature of the client. In philosophical consulting, the client is an organization. (Marinoff Dep. at 58). In group facilitation, the client is a group of individuals who seek to address issues common to the group. (Marinoff Dep. at 57–58). In philosophical counseling—the type of activity at the heart of this case— the client is an individual. (Marinoff Dep. at 54, 57).

Philosophical counseling takes place during private sessions between the philosophical counselor and the client. (Marinoff Dep. at 57, 88–91). During these sessions, the counselor engages the client in a philosophical dialogue in order to help the client manage and solve an "everyday" personal problem, such as how to navigate a particular career obstacle, or even significant personal matters, such as whether to have an abortion. (Marinoff Dep. at 61, 93, 95). Unlike traditional *psychological* counseling, *philosophical* counseling has

no state licensing requirement and is "completely unregulated in the United States." (Marinoff Dep. at 66).

Defendants are all officials of City College. Zeev Dagan is the Provost, to whom all the academic deans report (Declaration of Zeev Dagan ¶ 3); he is the highest-ranking official who is a party to this action. James Watts is the Acting Dean of the Division of the Humanities and the Arts, the division to which Professor Marinoff belongs. (Declaration of James F. Watts ¶¶ 1, 5). John Snyder is the Dean for Faculty and Staff Relations. As City College's "Legal Designee" he is also the College's "liaison" with the General Counsel of the City University of New York ("CUNY"), of which City College is a constituent college. (Declaration of John Snyder ¶¶ 1, 2). Arthur Spielman is the Chairman of City College's Institutional Review Board, which reviews and · approves all faculty research proposals involving human subjects on City College's campus. (Declaration of Arthur J. Spielman ¶¶ 1–2).

### B. Marinoff's Philosophical Counseling Activities on the City College Campus Prior to the Moratorium

Prior to the moratorium Marinoff engaged in two types of philosophical counseling activity with up to four clients per week on the City College campus: private practice and research. (Marinoff Dep. at 89–90, 96–98). Although Marinoff did not charge a set fee for the private clients he counseled on campus, he did ask them to make a "donation" to the American Philosophical Practitioners' · Association ("APPA"). He charged fees for those clients he counseled off campus. (Marinoff Dep. at 98). Marinoff not only co-founded the APPA, but he currently serves as a director and as its Chief Executive Officer and President. (Marinoff Dep. at 78–81).

Based at least partly on his on-campus research, Marinoff has published three books about philosophical counseling, "Plato Not Prozac!: Applying Eternal Wisdom to Everyday Problems," "Philosophical Practice," and "The Big Questions: How Philosophy Can Change Your Life," as well as individual case studies. (Pl.'s Local Rule 56.1 Counter Statement of Disputed Material Facts ¶¶ 53, 98–100; Marinoff Dep. at 94–96). Marinoff has also used his research to make presentations at other universities and at conferences. (Marinoff Dep. at 94–96).

Additionally, prior to the moratorium, Marinoff was in the process of founding a scholarly journal called *Noesis* dedicated to the theory and practice of philosophical counseling. (Pl.'s Local Rule 56.1 Counter Statement of Disputed Material Facts ¶ 101). In November of 2000, Dean Watts wrote a letter of institutional support for the journal on behalf of City College's Division of the Humanities and the Arts. (Letter of Institutional Support from James Watts dated Nov. 3, 2000, Exhibit 47 to Defendants' 56.1 Statement).

### C. The Wellness Center Proposal and the Moratorium

Through a contract with an outside service provider, City College's Wellness Center offered students such services as immunization, psychological counseling, social work services concerning health issues, emergency medical care, and other health services. (Wellness & Counseling Center Pamphlet, Defs.' Ex. 54; Snyder Decl. ¶ 6). Starting in late 1999, Marinoff sought to add philosophical counseling services to the roster of health services offered at the Wellness Center. (Marinoff Dep. at 107–09).

Marinoff developed this initiative with Thomas Morales, then Vice President of City College's Office of Student Affairs

(Marinoff Dep. at 107–09), but had not received official approval from any other City College official (Memo of James Watts to Stanford Roman and Zeev Dagan dated Aug. 24, 2000, Defs.' Ex. 38). Marinoff sought to recruit a roster of philosophical counselors certified by the group he co-founded—the APPA—to provide the counseling services; Marinoff planned to do no counseling himself. (Marinoff Dep. at 117). According to Marinoff, he also agreed to raise half the funding, with City College providing the other half. (Marinoff Dep. at 112–13).

Although an August, 2000 City College press release described the beginning of the Wellness Center initiative, Marinoff's attempt to add philosophical counseling to the Wellness Center's offerings never received official university approval, and the "stance" of Marinoff's own department— the Philosophy Department—on the initiative was "at best dubious." (Memo from James Watts to Stanford Roman and Zeev Dagan dated Aug. 24, 2000 and Attached Press Release, Defs.' Ex. 38).

Over the next few months, Watts, Dagan, and Dean Snyder corresponded about the possibility of adding philosophical counseling services to the Wellness Center. (Watts Decl. ¶¶ 8–16). Dean Snyder, as City College's Legal Designee to the university's General Counsel, expressed concern about the absence of a formal contract between City College and the APPA, as well as any liability that City College might incur if any client suffered harm through the provision of on-campus philosophical counseling services. (Fax from John Snyder to James Watts dated Oct. 17, 2000, Defs.' Ex. 41; Watts Decl. ¶ 11).

By October, Dagan was opposed to Marinoff's proposal. He wrote to Watts that, "I have to insist that this effort should be stopped immediately.... If Professor Marinoff wants to establish a formal counseling program at City College, the program should be developed with the appropriate contractual, legal, and financial guarantees." (Memo from Zeev Dagan to James Watts dated Oct. 20, 2000, Defs.' Ex. 43). Dagan stated that Snyder should contact the legal department "to ascertain the feasibility of this project." (*Id.*). Snyder then referred the matter to the Vice Chancellor for Legal Affairs for review. (Snyder Decl. ¶ 10; Memo from John Snyder to James Watts dated Nov. 3, 2000, Defs.' Ex. 46).

Meanwhile, Watts was becoming concerned about "the potential for danger to City College students" from philosophical counseling. (Watts Decl. ¶ 16). He learned that the APPA carried liability insurance in the amount of $2 million, which underscored his concerns about potential liability arising from any philosophical counseling activities on campus. (Watts Decl. ¶ 15). Watts also read an article in *The Washington Post* that recounted that "the emergence" of philosophical counseling had "horrified many traditional philosophers as well as psychotherapists who say that people in need of mental therapy should seek out professional help," i.e., psychiatrists, psychologists, and psychotherapists, not unlicensed philosophical counselors. (Watts Decl. ¶ 16; Valerie Strauss, *Philosophy Confronts Issues Raised by Technology, Genetics*, WASH. POST, Oct. 31, 2000 at A11, Defs.' Ex. 45).

On November 7, 2000—shortly after *The Washington Post* article appeared—Watts met with Marinoff and realized for the first time that Marinoff had already been providing philosophical counseling to students and private clients on the City College campus. (Watts Decl. ¶ 18). This knowledge again "raised an alarm" for Watts. (Watts Decl. ¶ 19). Watts was chiefly concerned about the on-campus

provision of philosophical counseling services by the APPA—a group that City College did not officially recognize—and by practitioners who were neither licensed nor regulated by any governmentally-recognized body. (*Id.*).

On the same day that he met with Marinoff, Watts spoke with Dagan and Snyder, both of whom agreed with Watts' concerns. (Dagan Decl. ¶¶ 8–10, 14; Snyder Decl. ¶¶ 11–12). Dagan then instructed Watts to tell Marinoff to temporarily stop his on-campus philosophical counseling activities until a legal evaluation could take place. That day, Watts sent Marinoff a letter stating as follows: "I am instructed to direct you to cease immediately all philosophical counseling activities being conducted on The City College Campus until such activities are evaluated by the Legal Department of The City University. Should you wish, you may contact Dean John Snyder and/or Provost Zeev Dagan for discussion beyond the points developed in our meeting this morning." (Letter from James Watts to Lou Marinoff dated Nov. 7, 2000, Defs.' Ex. 18; Dagan Decl. ¶¶ 9, 10). This letter commenced what the parties refer to as the "moratorium" on plaintiff's on-campus philosophical counseling activities. The moratorium remained in place from November 7, 2000 until July 17, 2002. (Letter of John Snyder to Lou Marinoff dated July 17, 2002, Defs.' Ex. 28).

### D. Jane Sovern's Legal Review and the Moratorium's Effect Upon Marinoff's Philosophical Counseling Activities

Jane Sovern, Deputy General Counsel for the City University of New York, immediately began a legal review of the proposed Wellness Center initiative as well as Marinoff's provision of philosophical counseling on campus. (Declaration of Jane M. Sovern ¶ 4).

Federal law requires that at all institutions that receive federal funds, an Institutional Review Board ("IRB") must be established to authorize in advance any research that involves human subjects. In addition, that authorization must be renewed annually. (Declaration of Ethel Breheny ¶¶ 5–8; Principal Investigator's Manual at 165, Exhibit Z of Plaintiff's Response to Defendants' 56.1 Statement). The purpose of the IRB is to "evaluate the 'risk to benefit' ratio of the research." (Principal Investigator's Manual at 165, Pl.'s Ex. Z). "The most important concerns of the IRB are to assure subjects' safety, preserve subjects' anonymity and confidentiality, and assure that participation is voluntary." (*Id.* at 166).

In 1994 Marinoff had submitted to City College's IRB a "research protocol" setting forth his desire to engage in philosophical counseling activities with the purpose of "develop[ing] theory and practice ... benefiting people in moral distress, and scholarly dissemination of research findings." (Human Subject Protocol at 12, Pl.'s Ex. N). The College's IRB approved the protocol and it was up for renewal by the IRB in the fall of 2000. (Breheny Decl. ¶¶ 9–16; Spielman Decl. ¶ 4).

However, once the Chair of the Institutional Review Board became aware of the College's direction to Marinoff to cease his on-campus philosophical counseling activities until a legal review was completed, the IRB "suspended further consideration of Professor Marinoff's research protocol, pending the completion of the legal review." (Spielman Decl. ¶ 5).

Marinoff wrote to Sovern in January of 2001 and stated that the moratorium was "unnecessary" since, "There was (and is) no philosophical counseling taking place at City College, both because my IRB approved protocol is under renewal, and because the proposed [Wellness Center]

counseling service is in abeyance pending your legal review." (Letter of Lou Marinoff to Jane Sovern dated Jan. 16, 2001, Defs.' Ex. 52). Marinoff also asked Sovern to enlarge the scope of her legal review to examine the issue of whether the IRB properly suspended its consideration of his research proposal. (*Id.*). In June, Sovern wrote Marinoff seeking specific information to assist her review, including such information as whether the APPA had been approved by the New York State Department of Education, particulars about that group's liability policy, whether City College students had paid for counseling, and information concerning Marinoff's activities for his IRB-approved research. (Sovern Decl. ¶¶ 9–10).

Rather than respond to Sovern's request, Marinoff filed this lawsuit on January 10, 2002. That same day, Sovern learned that the APPA planned to commence a three-day philosophical counseling conference on the City College campus the next day—January 11—but had not filed for the necessary approval from City College, which was due one month in advance. (Sovern Decl. ¶ 13; Marinoff Dep. at 247–52). Nonetheless, Sovern arranged for Marinoff to submit his materials for approval outside the normal process; that approval was granted and the conference proceeded as scheduled. (Sovern Decl. ¶ 13; Marinoff Dep. at 247–52).

In April of 2002 the parties signed a stipulation providing that pending the conclusion of Sovern's legal review, Marinoff "shall not engage in philosophical counseling that entails either payment or scheduling of separate counseling sessions." (Stipulation and Order dated April 15, 2002, Defs.' Ex. 57). That same month, which was ten months after Sovern had requested follow-up information from Marinoff, he sent her most of the information she had requested. (Defs.' Statement Pursuant to Local Rule 56.1 ¶¶ 79–85; Pl.'s

Response to Defs.' Statement Pursuant to Local Rule 56.1 ¶¶ 79–85). He never provided the information regarding his research (Sovern Decl. ¶¶ 9–10, 14–17), and asserts in this litigation that it was unnecessary to do so, since Ms. Sovern "was well aware of Marinoff's research, its history and his research applications" (Pl.'s Response to Defs.' Statement Pursuant to Local Rule 56.1, ¶¶ 80, 86).

### E. The End of the Moratorium

In July of 2002, three months after she received the requested information from Marinoff, Sovern completed her legal review and the moratorium ended. She concluded that City College was free to choose to enter into a contract with the APPA to provide philosophical counseling sessions at the Wellness Center if certain insurance requirements were met by the APPA and its counselors, and that City College was similarly free to enter into an agreement with Marinoff, if it chose to, to permit him to conduct counseling sessions on campus if certain insurance requirements were met. She added that the College was not obligated to do so. (Sovern Decl. ¶ 18; Letter of Jane Sovern to John Snyder dated July 17, 2002, Defs.' Ex. 27).

Dean Snyder subsequently wrote Marinoff that City College did not wish to contract with the APPA to provide philosophical counseling services at the Wellness Center, but that the College "will consider" a proposal by Marinoff to use his office for private philosophical counseling sessions. In conformity with Sovern's conclusions, Snyder wrote that City College would require Marinoff to carry insurance, would reserve the right to cancel the agreement, and would require Marinoff to produce an operating budget setting forth expected expenses, revenues, and the cost of any City College services he would require. (Snyder Decl. ¶ 18; Letter of John

Snyder to Lou Marinoff dated July 17, 2002, Defs.' Ex. 28).

Dean Snyder followed up that letter with a second letter to Marinoff, essentially restating the terms of the earlier letter but adding that Marinoff was completely free to conduct any IRB-approved research on the City College campus and he was also free to engage in any activities that he considered philosophical counseling but were not included in the April 15, 2002 Stipulation. (Letter of John Snyder to Lou Marinoff dated Aug. 22, 2002, Defs.' Ex. 29).

In November of 2002 the parties came to an agreement whereby Marinoff would submit his research protocol to another IRB within the CUNY system instead of City College's IRB.[1] (Marinoff Dep. at 230–31; Email from Kathryn Spann to David Koepsell dated November 19, 2002, Defs.' Ex. 30). However, as of Marinoff's deposition in May of 2004—17 months later—Marinoff had not submitted either a renewal application or a new proposal to the agreed-upon IRB. (Marinoff Dep. at 231–37). Marinoff asserts that he once contacted City College administrators in order to retrieve his research file, but that those administrators required Marinoff to assemble and submit a new research package. (Marinoff Dep. 233–36). Marinoff refused to assemble a new IRB proposal because he was on sabbatical at the time. (Id.).

Throughout this entire chain of events, Marinoff never asked Dagan, Snyder, Watts, or Sovern what Dean Watts meant when he informed Marinoff on November 7, 2000 to cease "all philosophical counseling activities" conducted on campus. (Marinoff Dep. at 157; Sovern Decl. ¶ 19; Watts Decl. ¶ 26). He did, however, understand that the direction pertained only to his on-campus counseling activities. (Marinoff Dep. at 37–38). Indeed, throughout the relevant timeframe, he continued to counsel private clients off the campus (Marinoff Dep. at 226–27), presumably for fees (Marinoff Dep. at 98).

In addition to not counseling private clients on the City College campus while the moratorium was in effect (Marinoff Dep. at 36–38), Marinoff claims that he also refrained from speaking to students and colleagues about philosophical counseling generally (Marinoff Dep. at 255–56). However, he could not recall the name of any person whose question he refrained from answering or when any such incident occurred. (Id.). Finally, Marinoff claims that the moratorium affected his ability to produce his journal, but fails to substantiate that allegation in any way. (Pl.'s Local Rule 56.1 Counter Statement of Disputed Material Facts, ¶¶ 101–07). Indeed, he states that the "work involved in the journal process has been extensive and the first issue is scheduled to be released in January of 2005." (Id. at ¶ 105).

## II. The Complaint and the Procedural History

The Complaint in this action originally consisted of claims pursuant to 42 U.S.C. §§ 1981 and 1983 against defendants in their official and personal capacities for violations of the First and Fourteenth Amendments. The relief sought included a declaratory judgment, an injunction, and damages. Marinoff later withdrew his section 1981 claim. (Order dated April 18, 2002; Trans. of Conf. of March 15, 2002, at 13:3–21).

In an Order dated April 18, 2002, this Court granted defendants' motion to dismiss the Complaint for lack of subject

---

1. The parties arranged for a different IRB to review Marinoff's research proposal because the College's IRB had recused itself from con-

sidering Marinoff's protocol. (Breheny Decl. ¶ 19).

matter jurisdiction and failure to state a claim. Specifically, the Court ruled that pursuant to the · Eleventh Amendment, City College and the individual defendants in their official capacities were immune from suit for damages. (*See* Trans. of Decision dated March 15, 2002, at 10:12–15). Additionally, the Court ruled that Marinoff had failed to state a section 1983 claim for violations of the First Amendment because (1) Marinoff's on-campus philosophical counseling activities did not constitute speech on a matter of public concern and (2) even if those activities did regard matters of public concern, the moratorium reflected a constitutionally appropriate balance of City College's institutional interests with Marinoff's First Amendment rights. (*Id.* at 27–29). Finally, the Court dismissed the Fourteenth Amendment claim, ruling that Marinoff had no protectable liberty interest in providing on-campus philosophical counseling services. (*Id.* at 31:15–21). In an Order dated April 22, 2002, the Court denied a motion for reconsideration of the dismissal. (Order dated April 22, 2002).

Marinoff appealed the Order dated April 18, 2002 only to the extent that it dismissed his First Amendment claim. (*See* Summary Order of the United States Court of Appeals for the Second Circuit. dated March 14, 2003, at 3). In a Summary Order dated March 14, 2003, the United States Court of Appeals for the Second Circuit vacated the dismissal of the First Amendment claim because "the district court did not have sufficient information on the basis of the complaint alone to make a determination of whether [Marinoff's speech was] protected," and remanded the case to this Court. (*Id.* at 4–5). Upon remand, the Complaint consisted

only of Marinoff's First Amendment claim against the individual defendants.

At a May 17, 2004 pretrial conference, Marinoff moved orally to amend and supplement his Complaint. The Court denied that motion, but set briefing schedules for a motion for reconsideration and summary judgment motions. (*See* Order dated May 17, 2004). The Court subsequently granted Marinoff's motion for reconsideration to the extent that he sought to amend his Complaint, but denied the motion to the extent that Marinoff sought to supplement his Complaint with a new claim. (*See* Order dated December 15, 2004). Marinoff then filed the First Amended Complaint, in which he asserts only one claim pursuant to 42 U.S.C. § 1983 for violations of his First Amendment rights and seeks declaratory and injunctive relief, compensatory and punitive damages, and attorney's fees and costs.

In anticipation of this summary judgment motion, the parties conducted discovery on the following three issues: (1) the nature of philosophical counseling; (2) any philosophical counseling activities that were impacted by the moratorium; and (3) the rationale for the moratorium. (*Id.*). Following the close of discovery, defendants moved for summary judgment dismissing the Complaint.[2]

### III.  Analysis

Defendants contend that this Court should grant summary judgment in their favor because (1) the philosophical counseling activities that the moratorium impacted were not matters of public concern; (2) even if those activities were of public concern, the moratorium appropriately balanced City College's institutional interests

---

**2.** Although the motion for summary judgment was originally made against the Complaint, the filing of the First Amended Complaint did not alter the parties' analysis in any way, and

they have consented to the motion for summary judgment being analyzed as against the First Amended Complaint.

with Marinoff's interest in speaking out on a matter of public concern; and (3) defendants are entitled to qualified immunity because there is no clearly established right to provide philosophical counseling on the City College campus.[3]

Marinoff responds that (1) the philosophical counseling activities that the moratorium impacted were matters of public concern; (2) the moratorium infringed his First Amendment right to speak out on a matter of public concern; and (3) defendants are not entitled to qualified immunity.

### A. The Summary Judgment Standard

The Court may grant summary judgment only if the evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); see *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995); accord *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court "is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir.2004).

The nonmoving party "may not rely on mere conclusory allegations or speculation, but instead must offer some hard evidence" supporting its version of events. *Id.* (quoting *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir.1998)). Ultimately, in order to defeat a motion for summary judgment, the nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Golden Pacific Bancorp v. F.D.I.C.*, 375

F.3d 196, 200 (2d Cir.2004) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (internal quotation marks omitted).

### B. Public Employee Speech and the First Amendment

██ "[T]he government may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *Latino Officers Ass'n, New York, Inc. v. City of New York*, 196 F.3d 458, 463 (2d Cir.1999) (quoting *United States v. National Treasury Employees Union*, 513 U.S. 454, 465, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) (*"NTEU"*)) (internal quotation marks omitted). When a public employee challenges government-imposed restrictions on his speech, the court must first determine whether the speech at issue can "be fairly characterized as constituting speech on a matter of public concern," which is defined as speech "relating to any matter of political, social, or other concern to the community . . . ." *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The "content, form, and context of a given statement, as revealed by the whole record" determines whether an employee's speech addresses a matter of public concern. *Id.* at 147–48, 103 S.Ct. 1684. This inquiry is a question of law. *Id.* at 148, n. 7, 103 S.Ct. 1684.

██ If the speech does not relate to a matter of public concern, "government officials should enjoy wide latitude in managing their offices," and "a federal court is not the appropriate forum in which to review" the government restriction. *Id.* at 146, 147, 103 S.Ct. 1684. However, when

---

**3.** There is no need to reach the question of defendants' qualified immunity because, as set forth *infra*, the Court concludes that (1) much of Marinoff's philosophical counseling activities involved only matters of private concern, and (2) the moratorium did not violate the First Amendment as applied to that part of Marinoff's philosophical counseling activities that did involve matters of public concern.

the speech at issue does regard a matter of public concern, the court must "arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). "The *Pickering* balance requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Connick*, 461 U.S. at 150, 103 S.Ct. 1684. While performing the balancing, the court must consider the "manner, time, and place of the employee's expression" as well as "the context in which the dispute arose." *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).

■ Ultimately, the government may restrict or sanction its employee's speech if: (1) the employer's prediction of disruption is reasonable; (2) the potential disruptiveness is enough to outweigh the value of the · speech; and (3) the employer took action against the employee based on this disruption and not in retaliation for the speech. *Jeffries v. Harleston*, 52 F.3d 9, 13 (2d Cir.1995); *see also Waters v. Churchill*, 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994); *Johnson v. Ganim*, 342 F.3d 105, 114 (2d Cir.2003). This balancing inquiry is generally a question of law. *Johnson*, 342 F.3d at 114.

■ However, the government must meet a higher burden in order to justify a speech restriction in the form of a generally applicable statute or regulation. *See NTEU*, 513 U.S. at 468, 115 S.Ct. 1003; *Latino Officers Ass'n*, 196 F.3d at 464–65; *Harman v. City of New York*, 140 F.3d 111 (2d Cir.1998). To justify such a restriction, the government "must show that the interests of both potential audiences and a vast group of present and future employ-

ees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation'" of the government. *NTEU*, 513 U.S. at 468, 115 S.Ct. 1003 (quoting *Pickering*, 391 U.S. at 571, 88 S.Ct. 1731); · *see also Latino Officers Ass'n*, 196 F.3d ·at 463; *Harman*, 140 ·F.3d at 118. When this standard applies, the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *NTEU*, 513 U.S. at 475, 115 S.Ct. 1003; *see also Latino Officers Ass'n*, 196 F.3d at 463; *Harman*, 140 F.3d at 123.

### C. Whether the Moratorium Impacted Speech on Matters of Public Concern

As noted above, prior to the moratorium Marinoff engaged in two kinds of on-campus philosophical counseling activity: private counseling sessions and counseling sessions pursuant to his research protocol. Additionally, at the time that the moratorium took effect, Marinoff was both developing an academic journal and attempting to have the Wellness Center offer philosophical counseling services. Defendants assert that Marinoff's philosophical counseling activities—the private counseling sessions, the research protocol counseling sessions, and the contemplated counseling sessions through the Wellness Center— constitute speech on matters of private concern. Defendants also claim that the moratorium did not impede the development of Marinoff's academic journal. Marinoff opposes both contentions.

### 1. Private Counseling Sessions

■ The record is clear that Marinoff's private counseling sessions involved matters solely of private concern. First, the content of philosophical counseling ses-

sions is personal. In Marinoff's own words, philosophical counseling consists of advising people in a way to "help them manage an everyday problem." (Marinoff Dep. at 164, 95). Marinoff described his own role as "trying to help people apply philosophy to their management and hopefully the resolution of everyday problems." (Marinoff Dep. at 95). In philosophical counseling, the "issue becomes personalized" (Marinoff Dep. at 61), and the discussion is "tailored to [the client's] needs" (Marinoff Dep. at 211).[4] Because the subject matter addressed in private philosophical counseling sessions regards a particular individual's own problems, challenges, or moral dilemmas (Marinoff Dep. at 61), it does not have political, social, or other relevance to the concerns of the community in general.

In addition, the context in which philosophical counseling occurs illustrates that the treatment is tailored to the needs of a particular client. The Standards of Professional Ethical Practice for the American Philosophical Practitioners Association—which, as noted, Marinoff co-founded and for which he serves as President, CEO, and a director—reflect this understanding of philosophical counseling. (Marinoff Dep. at 80–81). For example, the APPA's "Fundamental Canons" require that philosophical counselors practice "for the benefit of their clients." (APPA Certification Standards and Standards of Professional Ethical Practice, Defs.' Ex. 6). The ethical standards state that the counselor should halt sessions when "to the client's satisfaction, the purposes for which [the services] were sought have been fulfilled...." (*Id.*).

The ethical standards also describe philosophical counseling as a "professional service" in which the practitioner should "maintain utmost respect for client welfare...." (*Id.*). Several ethical standards require the philosophical counselor to affirmatively "safeguard a client's right to privacy by treating as confidential all information obtained from the client...." (*Id.*). In short, these standards establish that philosophical counseling focuses on treating the individual, personal problems of the "client" being counseled.

Finally, the form of philosophical counseling sessions is designed to facilitate individual treatment. The sessions occur in a private, one-on-one setting and the interchanges consist of dialogue between two people—a form designed to facilitate the discussion of matters personally important to an individual client. *See, e.g., Verri v. Nanna,* 972 F.Supp. 773, 786–87 (S.D.N.Y. 1997).

While Marinoff contends that the private nature of speech does not "vitiate the status of the statement as addressing a matter of public concern," private speech must have some connection to the concerns of the community in order to constitute speech on a matter of public concern. *Rankin v. McPherson,* 483 U.S. 378, 387 at n. 11, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *see also San Diego v. Roe,* —— U.S. ——, 125 S.Ct. 521, 525–26, 160 L.Ed.2d 410 (2004); *Givhan v. W. Line Consol. School Dist.,* 439 U.S. 410, 414–16, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). For example, in *Rankin,* the plaintiff made a private remark to her boyfriend and coworker that the United States Supreme

4. Examples given by plaintiff of problems addressed by philosophical counseling include someone wanting to "feel more valued in her job," or dealing with an impending divorce, or confronting issues raised by her child's marriage to someone of a different faith, or handling terminal cancer, or dealing with personal feelings raised by exclusion from jury duty. (Statement of Scope of Practice and Research Protocol for Philosophical Counseling ¶ 2, Defs.' Ex. 12).

Court classified as speech on a matter of public concern. *Rankin*, 483 U.S. at 386, 107 S.Ct. 2891. However, the plaintiff's remark concerned her hope that someone would assassinate the President of the United States, most assuredly a matter of public concern. *Id.* at 381, 107 S.Ct. 2891. Here, in contrast, Marinoff has offered no evidence showing that the matters he discussed privately with clients have any relevance to the community at large.

Marinoff submits several declarations in support of his contention that his private philosophical counseling sessions constitute speech on a matter of public concern. However, these declarations merely assert that philosophical counseling is socially significant without providing any facts showing why that assertion is true. (*See* Declaration of J. Michael Russell; Declaration of Merle Hoffman; Declaration of Jonah Ming Lee). Moreover, those declarations actually support defendants' claim that philosophical counseling is of private concern. (*See, e.g.* Declaration of Michael F. Stample ¶ 11 ("It is my understanding that philosophical counselors use the resources of the philosophical tradition to help individuals deal with their everyday concerns, such as facing ethical dilemmas and living meaningful lives.")). Additionally, other declarations fail to address the philosophical counseling activities that the moratorium impacted, but instead concern Marinoff's off-campus activity. (*See* Declaration of Tanis Salant; Declaration of Michael F. Stample). Plaintiff's off-campus activities were not affected by the moratorium in any way, and he was always free to continue those private counseling sessions.

In sum, the Court concludes as a matter of law that Marinoff's on-campus private philosophical counseling sessions do not constitute speech on a matter of public concern. Other courts considering other instances of one-on-one counseling have come to the same conclusion. *See Clark v. Holmes*, 474 F.2d 928, 931 (7th Cir.1972), cert. denied, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973); *Principe v. Stewart*, 1986 WL 1538 (E.D.Pa.1986).

### 2. *Counseling Through the Wellness Center*

■ As set forth above, Marinoff sought to have City College's Wellness Center offer individual philosophical counseling sessions to students. Those proposed counseling sessions would have been the same as plaintiff's private on-campus sessions, only offered through the Wellness Center instead of directly by plaintiff. Because, as concluded above, the speech involved with individual counseling sessions does not regard a matter of public concern, it is irrelevant whether the counseling sessions take place under the aegis of the Wellness Center or not.

In addition, to the extent that Marinoff claims that his advocacy for the idea that City College ought to offer philosophical counseling services to its students is itself a matter of public concern, the moratorium never prevented Marinoff from expressing that message. The November 7, 2000 letter from Watts merely prohibited Marinoff from engaging in on-campus counseling sessions, not from advocating that City College should offer such services itself. Indeed, Marinoff makes no specific claim that he was not free to advocate for the establishment of philosophical counseling services at the Wellness Center.

### 3. *Academic Journal*

Marinoff contends that the moratorium impeded his ability to produce the academic journal *Noesis*. Setting aside the question of whether the journal constitutes speech on a matter of public concern, Marinoff has made no showing whatsoever that the moratorium in fact impeded his ability

to produce the journal, apart from his ipse dixit statement that it is so. In fact, Marinoff's counter statement of facts supports the opposite view as follows: "The work involved in the journal process has been extensive and the first issue is scheduled to be released in January of 2005." (Pl.'s Local Rule 56.1 Counter Statement of Disputed Material Facts ¶ 105). There simply are no facts in the record to support the view that the moratorium affected Marinoff's ability to publish the journal in any way. Accordingly, the Court concludes that the moratorium did not impede Marinoff's work on the journal, regardless of whether the journal constitutes speech on a matter of public concern.

### 4. *Marinoff's Research*

█ Marinoff's research constitutes speech on a matter of public concern because it addresses the questions of whether and how philosophical counseling is a socially useful therapeutic treatment, how it can be improved, and how its risks can be minimized. Marinoff's research purportedly focused on developing philosophical counseling as a method for "the resolution of moral conflict" and as a means of "dispute resolution more broadly construed...." (Human Subject Protocol, Pl.'s Ex. N at 9). Unlike private counseling sessions—which concern personal issues relevant to a particular individual— research into the methodology and efficacy of philosophical counseling speaks to broader questions of general social applicability. Marinoff's research resulted in three books, as well as published case studies and articles in scholarly journals. (Pl.'s Rule 56.1 Counter Statement of Disputed Material Facts ¶ 53). Marinoff planned to compile and publish the findings of the research project he was pursuing at the time of the moratorium. (Human Subject Protocol, Pl.'s Ex. N at 9). Indeed, the development of philosophical counseling as therapy—a development to which Marinoff's research directly contributes—has catalyzed a public debate about the benefits and dangers of this method of therapy as compared to traditional licensed and regulated psychological counseling. (Marinoff Decl. ¶¶ 5, 6, 40; Press Clippings & Marinoff's Media Log, Pl.'s Ex. at 16–18, 287–316).

Indeed, legislation has been introduced in the New York State Assembly that would establish certification requirements for philosophical practitioners and begin the process of bringing this field under governmental regulation. (Letter of Assemblyman Ruben Diaz, Jr. of May 25, 2001, Pl.'s Ex. at 517). Marinoff's research contributes to both the social question of whether or not philosophical counseling is a positive therapeutic method and the political question of the whether and how New York State ought to recognize and regulate the practice of philosophical counseling. Accordingly, his research constitutes speech on a matter of public concern.

### D. *Whether the Moratorium, as Applied to Marinoff's Research, Violated the First Amendment*

Having established that the moratorium impacted speech on a matter of public concern—Marinoff's research—the Court must now "arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731. Initially, the Court must determine which balancing standard applies to this case—the more deferential balancing employed in *Pickering* and *Connick*, or the more stringent standard applied in *NTEU*.

### 1. *The Applicable Standard*

Marinoff contends that the *NTEU* standard should apply to this case because the moratorium operated as a prior restraint. In support of this assertion, Marinoff cites the U.S. Supreme Court decision in *NTEU* and the decision of the U.S. Court of Appeals for the Second Circuit in *Harman.* However, both of those cases are distinguishable from this litigation in that they concerned generally applicable speech restrictions.

In *NTEU,* the United States Supreme Court considered the constitutionality of section 501 of the Ethics Reform Act of 1989, which "broadly prohibit[ed] federal employees from accepting any compensation from making speeches or writing articles." *NTEU,* 513 U.S. at 457, 115 S.Ct. 1003. The ban applied to "nearly all employees of the Federal Government...." *Id.* at 459, 115 S.Ct. 1003. Additionally, the ban applied "even when neither the subject of the speech or article nor the person or group paying for it has any connection with the employee's official duties." *Id.* at 457, 115 S.Ct. 1003.

The restriction at issue in *Harman* similarly was broad in both its scope and its application to a large number of potential speakers. In that action, two city Executive Orders forbade all employees of the Child Welfare Administration and the Human Resources Administration "from speaking with the media regarding any policies or activities of the agency without first obtaining permission from the agency's media relations department." *Harman,* 140 F.3d at 115.

■ In its analysis of *NTEU* and ·*Harman,* the Second Circuit wrote, "Application of the *NTEU* standard turns on whether a government employee's expression is restricted through a generally applicable statute or regulation, as opposed to a particularized disciplinary action...." *Latino Officers Ass'n,* 196 F.3d at 464

(quoting *Weaver v. United States Info. Agency,* 87 F.3d 1429, 1439 (D.C.Cir.1996), *cert. denied,* 520 U.S. 1251, 117 S.Ct. 2407, 138 L.Ed.2d 174 (1997)) (internal quotation marks omitted).

In this case, the challenged restriction—the 20–month moratorium—applied by its terms only to Marinoff. The November 7, 2000 letter from Watts stated that, "I am instructed to direct you"—meaning Marinoff—to cease his on-campus philosophical counseling. The moratorium was "particularized" instead of "generally applicable." Thus, the balancing standard from *Pickering,* instead of *NTEU,* applies. Under the *Pickering* standard, the Court must consider the "manner, time, and place of the employee's expression" as well as "the context in which the dispute arose." *Rankin,* 483 U.S. at 388, 107 S.Ct. 2891. Defendants must demonstrate that: (1) their prediction of disruption is reasonable; (2) the potential disruptiveness is enough to outweigh the value of the speech; and (3) they imposed the moratorium based on this disruption and not in retaliation for the speech. *Jeffries,* 52 F.3d at 13; *Johnson,* 342 F.3d at 114.

### 2. *Balancing of Interests*

■ Marinoff's interest in conducting his research is to contribute to the development of philosophical counseling as a form of therapy or dispute resolution. That his research occurs within the context of an academic setting—which is "peculiarly the marketplace of ideas," *Keyishian v. Bd. of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (internal quotation marks omitted)—increases the weight of Marinoff's interest.

Defendants assert two interests in imposing the moratorium: first, that the provision of unlicensed, unregulated counseling services to City College students contained the potential to harm those stu-

dents, especially if they were in need of professional psychological or psychiatric care; second, that City College might be liable for any harm resulting from the provision of philosophical counseling services.

Marinoff claims that defendants' concern about potential harm to City College students was unreasonable because his philosophical counseling activities previously had not caused any harm and because defendants took no efforts prior to imposing the moratorium to determine the level of risk. As to the first contention, the *Pickering* balancing standard does not require that defendants show actual harm. *Jeffries,* 52 F.3d at 13. Instead, defendants must show only that their predictions of possible harm were reasonable. *Id.*

As to Marinoff's second contention— that defendants did not attempt to determine the level of risk—the extent to which defendants investigated the risks of philosophical counseling may be relevant in determining the reasonableness of defendants' concern, but it is not dispositive. Moreover, the record establishes that defendants in fact did undertake efforts to understand what philosophical counseling was and how Marinoff was practicing it on the City College campus, including meetings with, and memos to, Marinoff. (Watts Decl. ¶¶ 5–22; Dagan Decl. ¶¶ 5–9; Snyder Decl. ¶¶ 5–12).

Defendants' concerns over the risks to students from philosophical counseling sessions and possible liability on the part of City College were reasonable, based upon several factors. First, philosophical counseling is completely unlicensed and unregulated. There are no criteria determining who may become a philosophical counselor; no established entities offering a comprehensive course of study and training for philosophical counselors; and no widely recognized body to promulgate and enforce standards of practice. Marinoff stated that in fact unqualified and "unscrupulous people" have joined philosophical counseling organizations and "print[ed] up business cards and advertis[ed] themselves as philosophical counselors.... This is fraud in my terms." (Marinoff Dep. at 72).

Second, philosophical counseling sessions, which can influence or even guide a client in making personal decisions of enormous magnitude, have potentially harmful consequences. For example, Marinoff stated that philosophical counseling sessions sometimes concern questions such as, "[S]hould I have an abortion or not or should I euthanize someone or not." (Marinoff Dep. at 61). It certainly was reasonable for City College to want to have time to analyze and evaluate the risks to students of these unregulated sessions and the possible exposure to City College if a student, or parents of a student, believed on-campus philosophical counseling sessions had led a student into a disastrous, even fatal, mistake and sought to hold City College liable.

Third, philosophical counseling is a relatively new field (Marinoff Dep. at 25–26), where the benefits and risks are not fully, or perhaps even substantially, understood. Certianly, no such analysis has been proffered by plaintiff. Fourth, the student population at City College consists of young people who may be more vulnerable to potential harm than the average independent and experienced adult. Fifth, Marinoff's own group, the APPA, carried $2 million worth of liability insurance (Marinoff Dep. at 130), which illustrates that the potential for harm and ensuing liability was reasonable enough for the APPA to insure against. Finally, Marinoff, a City College employee, was performing philosophical counseling on campus. Any harm that occurred because of Marinoff's philosophical counseling could

have implicated City College as Marinoff's employer. All of these considerations, taken together, lead the Court to conclude that defendants were reasonably concerned about potential harm to students and liability on the part of City College.

The Court also concludes that the potential for harm to students and liability on the part of City College outweighs the value of the speech at issue. City College's interest in safeguarding its students from the potential risks of new, unregulated therapies is a weighty one. Indeed, ensuring that its students are not exposed to unnecessary risks on its own campus is clearly part of City College's mission.

On the other hand, the context in which the dispute arose and evolved illustrates that the burden on Marinoff's research was relatively light. Although the City College IRB suspended its consideration of Marinoff's research protocol renewal application pending completion of the College's legal review (Spielman Decl. ¶ 5), Marinoff was free to conduct his research off campus with his private clients, whom he regularly counseled at his home office. Marinoff frequently shuttled clients between his private clients and his research protocol clients depending on whether there were available slots on his protocol (Marinoff Dep. at 98–100), so conducting his research with his private clients alone would not have impacted the kind of subjects upon which his research depended.

In addition, Marinoff's own actions demonstrate that the burden on his research was minimal. For example, Deputy General Counsel Sovern wrote Marinoff requesting certain follow-up information from him in order to complete her legal review, but Marinoff waited a full 10 months—until April 2002—to provide the requested information, and Marinoff never provided Sovern with requested information concerning his research. (Sovern Decl. ¶¶ 9–17; Defs.' Statement Pursuant

to Local Rule 56.1 ¶¶ 79–86; Pl.'s Response to Defs.' Statement Pursuant to Local Rule 56.1 ¶¶ 79–86). Additionally, even though the parties agreed in November of 2002 that Marinoff could submit his protocol to another IRB within the CUNY system for its consideration (Marinoff Dep. at 229–37; Email from Kathryn Spann to David Koepsell, Defs.' Ex. 30), as of May of 2004 Marinoff had not submitted a new application (Marinoff Dep. at 229–37) despite more than ample time and opportunity to do so.

Although Marinoff contends that the moratorium was so vague and overbroad as to prevent him from speaking about philosophical counseling in even the most general terms, the established facts completely undermine this assertion. First, Marinoff was unable to recall the name of a single person to whom he refrained from speaking about philosophical counseling. (Marinoff Dep. at 255–56). Despite his claim that the moratorium was vague and overbroad, Marinoff never asked any defendant exactly what activities the moratorium pertained to. (Marinoff Dep. at 157; Sovern Decl. ¶ 19; Watts Decl. ¶ 26). In addition, during the time that the moratorium was in effect, City College allowed Marinoff to hold a three-day philosophical counseling session on campus (Sovern Decl. ¶ 13; Marinoff Dep. at 247–52), which illustrates that the moratorium did not affect Marinoff's ability to discuss philosophical counseling at City College.

Marinoff's letter to Sovern of January of 2001 also reveals that Marinoff understood the term "philosophical counseling activities"—which is all the moratorium prohibited—to refer to the actual counseling of individual clients (Sovern Decl. ¶ 8; Letter from Lou Marinoff to Jane Sovern dated January 16, 2001, Defs.' Ex. 52); the stipulation that the parties entered into again reflects this understanding (Stipulation

and Order dated April 15, 2002, Defs.' Ex. 57). Finally, Marinoff admits that he understood the moratorium to apply only to his on-campus activities. (Marinoff Dep. at 226–27).

The facts set forth above show that the restriction upon Marinoff's research was limited in time, scope, and degree. Moreover, those facts show that this restriction was mild enough that over the course of ten months, Marinoff never provided Sovern with the materials she required for her review, and Marinoff waited at least 17 months to submit a new research protocol to the agreed-upon IRB. Accordingly, the Court concludes that defendants' concerns of harm to students and liability on the part of City College outweigh the value of Marinoff's temporarily suspended research.

Finally, the Court concludes that defendants imposed the moratorium in response to their concerns and not in retaliation for Marinoff's speech. Marinoff makes vague reference to a possible conspiracy between defendants and City College's psychology faculty, whom Marinoff believes desire to retard and discredit philosophical counseling because it infringes on the province of traditional psychological counseling. (Marinoff Dep. at 39–40, 120–128). Despite Marinoff's references to a "turf war" between philosophical counselors and clinical psychologists (Marinoff Dep. at 127), there is nothing in the record to support his assertion.

To the contrary, the context of the dispute shows that bona fide concerns about the potential risks of philosophical counseling and ensuing liability motivated defendants to impose the moratorium and temporarily suspend Marinoff's research. Defendants did not issue the moratorium until they learned that Marinoff already was providing counseling services on campus. (Snyder Decl. ¶ 11; Watts Decl. ¶¶ 18–19; Dagan Decl. ¶¶ 8–9).

In fact, as noted above, defendants have supported Marinoff in other philosophical counseling endeavors. On behalf of City College and during the time that the moratorium was in effect, Sovern made an extra effort to allow Marinoff's on-campus philosophical counseling conference to proceed as planned, despite Marinoff's failure to comply with City College's event registration policies. (Sovern Decl. ¶ 13; Marinoff Dep. at 247–52). In addition, mere days before the moratorium on philosophical counseling sessions took effect, Watts issued an institutional letter of support for Marinoff's proposed philosophical counseling journal and agreed to provide office space for the journal. (Watts Decl. ¶¶ 17, 25). These facts, as well as the absence of any facts to the contrary, show that defendants imposed the limited moratorium only in order to determine the legal feasibility of Marinoff's on-campus philosophical counseling activity.

In sum, the Court concludes that defendants did not violate Marinoff's First Amendment rights by imposing the moratorium: defendants' concerns over potential harm and liability were reasonable and outweighed the First Amendment value of Marinoff's research, and defendants imposed the limited moratorium in response to their legitimate concerns.

## Conclusion

For the reasons set forth above, the Court grants defendants' motion for summary judgment. The Clerk of Court shall enter judgment dismissing the First Amended Complaint.